INDIANA GENERAL CORP., Plaintiff,

v.

KRYSTINEL CORP., Defendant (two cases).

No. 63 Civ. 479.

United States District Court
S. D. New York.

Feb. 17, 1969.

Hofgren, Wegner, Allen, Stellman & McCord, James C. Wood, Chicago, Ill., for plaintiff, Davis, Hoxie, Faithfull & Hapgood, Richard Whiting, New York City, of counsel.

Arthur, Dry, Kalish, Taylor & Wood, Harvey Bumgardner, Jr., New York City, for defendant, Martin J. Cohen, Ira J. Krakower, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action arising under the Patent Laws of the United States, 35 U.S.C. §§ 283, 284, for infringement of United States Letters Patent No. 3,036,009, issued on May 22, 1962, naming Georg Zerbes as inventor and entitled "Ferro-magnetic, Ceramic Body with High Quality at High Frequency". Plaintiff seeks an injunction and damages.

After hearing the testimony of witnesses, examining the exhibits, the pleadings, the briefs and the proposed findings of fact and conclusions of law submitted by counsel, this Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. Plaintiff, Indiana General Corporation (hereinafter referred to as "Indiana General"), is a corporation organized and existing under the laws of the State of Indiana and has its principal place of business in the City of Valparaiso, Porter County, Indiana. Prior to a merger with the Indiana Corporation in 1959, plaintiff was known as "General Ceramics".

2. Steatit - Magnesia Aktiengesellschaft (hereinafter referred to as "Stemag"), a corporation which, pursuant to an agreement, exchanged scientific information with plaintiff, was organized and exists under the laws of the Federal Republic of Germany and has its principal place of business in Lauf (Pegnitz), Germany.

3. Defendant, Krystinel Corporation (hereinafter referred to as "Krystinel"), is a corporation organized and existing under the laws of the State of New York and has its principal place of business in Portchester, Westchester County, New York.

4. The patent in suit, United States Letters Patent No. 3,036,009, issued May 22, 1962, has one claim which reads as follows:

"I claim:

A magnetic core body having a high Q-factor in the high frequency range of up to 300 mcs. Comprising a sintered nickel-zinc ferrite prepared by firing at about 1100° C. to about 1350° C. a composition consisting essentially of the NiO, ZnO, and the ferric oxide components set forth in weight percent within the area A-B-C-D of the drawing, said composition comprising in addition 1 to 5 weight percent of manganese oxide based on the total weight percent, and 1–60% by weight of cobalt oxide based on the proportion of nickel oxide in the said composition, the amount of cobalt oxide being within 0.1 to 3.0% by weight of the total composition, the proportion of iron oxide in said batch being at

least 50 mol percent of the entire composition." [1]

5. Although the patent in suit claims ranges of percentages for each of its 5 components rather than describing the specific formula which plaintiff asserts produces a Q-factor of 470 at 1 mc.,[2] Table 1 of the patent in suit sets forth three examples of variations on the 5-component combination, each of which is shown to effect an improvement in the Q-factor of the nickel-zinc-ferrite system in the frequency range of 1 mc.[3]

6. More simply, the claimed invention of the patent in suit is the discovery that small additions of both cobalt and

1. The drawing referred to in the claim and represented here is a triaxial diagram containing the trapazoidal figure A–B–C–D. Within the area of the trapazoid lies every nickel-zinc ferrite combination claimed by the patent in suit.

2. The term "Q-factor" or quality value is a quotient which characterizes the efficiency of the material. It is inversely proportional to and a positive way of expressing the loss factor of the ferrite body.

3. Table 1 of the patent in suit is represented below:

## Table 1

| Composition in Weight percent | | | $\mu_\bullet$ | Q at 1 Megacycle | | Q Improvement, percent | CoO: 100 NiO |
| ZnO | NiO | $Fe_2O_3$ | | Without addition | With cobalt manganese additions, CoO = 0.7% of batch, MnO = 2% of batch | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 12.0 | 16.0 | 72.0 | 60 | 88 | 153 | 74 | 4.4 |
| 19.2 | 4.2 | 76.6 | 60 | 56 | 124 | 121 | 16.7 |
| 22.0 | 11.1 | 66.9 | 250 | 20 | 63 | 214 | 6.3 |

manganese to a nickel-zinc-ferrite, having an excess of 50 mol percent [4] of the iron component, enhances the Q-factor of the ferrite far more than that which is produced by adding either cobalt or manganese alone.

7. The ferromagnetic ceramic body of the patent in suit is a composition of matter generally referred to as a "ferrite". This composition results from mixing the described oxides in specified proportions, after which the mixture is pressed into a desired shape followed by firing or sintering at a temperature between 1100° C. and 1350° C. During the sintering process, a chemical reaction occurs to produce the ferrite. The oxides included within the claim of the patent are specified in weight percentages of the whole composition as:

| | |
|---|---|
| Ferric oxide ($Fe_2O_3$) | 66.5%–80.0% |
| Nickel oxide (NiO) | 2.0%–29.5% |
| Zinc oxide (ZnO) | 2.0%–31.5% |
| Cobalt oxide (CoO) | .1%– 3.0% |
| Manganese oxide (MnO) | 1.0%– 5.0% |

with the further requirement that the cobalt oxide be within the range of 1 to 60 percent by weight of the nickel oxide addition and that the ferric oxide be at least 50 mol percent of the entire composition.[5]

8. The ferrite composition of the patent in suit found particular use as an antenna rod in home radio receiving sets. An antenna is a pencil-like rod or rectangular strip made of the ferrite composition around which turns of wire are wound. The ferrite core rod presents less resistance to the passage of radio waves than does the surrounding air (spoken of as "permeability") so that broadcast radio waves pass through or near the ferrite rod. The radio waves, by cutting across the turns of wire, induce a current therein, which when conducted to other circuits in the radio, is amplified to audible sound. Suffice it to say that, generally, the higher the Q-factor of the ferrite material, the more efficient the antenna. As mentioned above, the Q-factor is also the reciprocal function of "loss". Therefore, since the radio broadcast signals are relatively weak and do not have much contained energy, the antenna rod material must have a low loss factor so that most of the energy which is received from the radio waves is conducted to the radio circuits.

9. During 1951 and thereafter, General Ceramics was manufacturing antenna rods for the radio industry with less than satisfactory results. Under the trademark "FERRAMIC", General Ceramics made and sold a material labeled "Ferramic J" which consisted of a nickel-zinc ferrite containing small additions of magnesium and manganese. Its Q-factor was relatively low and the impedance of the antenna circuit was negatively af-

---

4. A "mol" is the quantity of a substance of which its weight in grams is equal to its molecular weight. A "mol percent" is the percentage represented by the number of mols of an ingredient in a mixture or compound as compared to the total number of mols present therein.

5. Pg. 5. The references cited in the file of this patent are:

United States Patents

| | | |
|---|---|---|
| 2,656,319 | Berge | Oct. 20, 1953 |
| 2,700,023 | Albers-Schoenberg | Jan. 18, 1955 |
| 2,723,239 | Harvey | Nov. 8, 1955 |
| 2,736,708 | Crowley | Feb. 28, 1956 |
| 2,925,388 | Harvey | Feb. 16, 1960 |

Foreign Patents

| | | |
|---|---|---|
| 751,623 | Great Britain | July 4, 1956 |
| 752,659 | Great Britain | July 11, 1956 |

Other References

Smith's College Chemistry, 6th ed., p. 643, pub. by D. Appleton-Century Co., N.Y. 1946.

fected by the passage of time, the ambient temperature variations and the shocks normally resulting during the process of shipping the radios to market, all of which produced customer dissatisfaction.

10. During the latter part of 1952 and throughout 1953, General Ceramics was making and selling a "Ferramic N" antenna rod material which consisted of a nickel-zinc ferrite with the addition of a small amount of manganese. The chemical formula of the 4-component "N-body" by percentage weight of the total composition was as follows:

| | |
|---|---|
| Ferric oxide ($Fe_2O_3$) | 75.5% |
| Nickel oxide (NiO) | 9.2% |
| Zinc oxide (ZnO) | 13.5% |
| Manganese oxide (MnO) | 1.8% |

Although the N-ferrite possessed a higher Q-factor than did the "J" material, the same difficulties were experienced by the radio manufacturers with regard to the impedance of the antenna circuit.

11. Georg Zerbes, the named inventor of the patent in suit, is a resident of Germany and an employee of Stemag. In 1953, a cooperative business arrangement regarding the sharing of scientific information existed between Stemag and a subsidiary of Indiana General, Steatite Research Corporation (hereinafter referred to as "Steatite Research"), located in Keasbey, New Jersey. Dr. Albers-Schoenberg, president of Steatite Research, while visiting Stemag in August of 1953, was informed of Georg Zerbes' new ferrite formula, which information Dr. Albers-Schoenberg communicated in a letter to Salvatore Ortepio, an employee of General Ceramics (see Plaintiff's Exh. 51). The new formula consisted of (by weight percent):

| | |
|---|---|
| Ferric oxide ($Fe_2O_3$) | 75.1% |
| Nickel oxide (NiO) | 9.0% |
| Zinc oxide (ZnO) | 13.3% |
| Manganese oxide (MnO) | 1.8% |
| Cobalt oxide (CoO) | .66% |

12. During the latter part of 1953, General Ceramics made laboratory samples of the Zerbes ferrite formula.

Q-factors in the neighborhood of 400 were obtained, representing values significantly higher than had previously been achieved with the Ferramic J and N materials. The low temperature factor which resulted from the new product indicated that external temperature changes would not materially affect the impedance of the antenna circuit. It was expected that the new ferrite would be stable against both shock and the passage of time.

13. The first large 300 kilogram batch (designated by the formula number 2017-C) was in preparation on November 14, 1953. From the 300 kilogram batch, sample antenna rods were made and soon thereafter sent to certain radio set manufacturers together with a specification sheet dated November 18, 1953, identifying the ferrite as 2017-C and by the trademark "Ferramic Q". Its Q-factor was reported at 470. The chemical formula which represented the Ferramic Q material as it was marketed and sold was as follows:

| | |
|---|---|
| Ferric oxide ($Fe_2O_3$) | 75.1% |
| Nickel oxide (NiO) | 9.1% |
| Zinc oxide (ZnO) | 14.0% |
| Manganese oxide (MnO) | 1.4% |
| Cobalt oxide (CoO) | .9% |

(.9% CoO representing 9.7% of the NiO content)

14. A view of the history preceding and leading up to the issuance of the patent in suit, which patent is alleged to protect the above-stated formula for plaintiff's Ferramic Q material, reveals that on November 27, 1953, Georg Zerbes filed application for patent Serial No. St 7388 VIb/80b (hereinafter referred to as "the German application") in the Patent Office of the Federal Republic of Germany. This application was filed in the names of Stemag and Steatite Research.

15. The German application disclosed a range of 4-component ferrite compositions including, as their principal components, $Fe_2O_3$, NiO, ZnO and CoO. The proportions of these components were

disclosed in terms of a range of basic 3-component systems (Fe₂O₃, NiO, ZnO) varying as follows:

| | |
|---|---|
| Ferric oxide (Fe₂O₃) | 58.0%–80.0% |
| Nickel oxide (NiO) | 2.0%–40.0% |
| Zinc oxide (ZnO) | 2.0%–40.0% |

The disclosed range of CoO was "between 1 and 60% by weight of Cobalt oxide calculated as CoO with reference to the NiO content." (See Plaintiff's Exh. 43 at 7.) However, the preferable range of the cobalt oxide component consisted of between 2 and 30% by weight based on the content of the nickel oxide.

16. The German application also disclosed a range of 5-component ferrite compositions including, as their principal components, Fe₂O₃, NiO, ZnO, MnO and CoO. The proportions of these components are similarly disclosed with reference to the above-stated ranges of the basic 3-component systems coupled with the statement that a deterioration in quality occurs when the iron oxide content falls below 66% by weight of the total composition. Although not expressly disclosed, it is assumed from the claims that the same range of CoO is desired as is disclosed with reference to the 4-component ferrites. The range claimed for the manganese oxide component was from 1 to 10% by weight of the total composition.

17. The three examples in Table 2 of the German application [6] disclose 5-com-

6.

### Table I

| COMPOSITION IN WEIGHT % | | | | Q at 1 Megacycle | | | |
|---|---|---|---|---|---|---|---|
| ZnO | NiO | Fe₂O₃ | Hâ | Without addition | With CoO addition CoO=0.7% of the batch | Q Improvement | CoO: 100 NiO |
| 30.0 | 10.0 | 60.0 | 70 | 104 | 152 | 46% | 7.0 |
| 12.5 | 20.0 | 67.5 | 50 | 78 | 128 | 64% | 3.5 |
| 17.0 | 6.6 | 76.4 | 100 | 58 | 130 | 124% | 10.6 |

### Table 2

| COMPOSITION IN WEIGHT % | | | | Q at 1 Megacycle | | | |
|---|---|---|---|---|---|---|---|
| ZnO | NiO | Fe₂O₃ | Hâ | Without addition | With cobalt manganese additions CoO =0.7% of batch MnO=2.% of batch | Q Improvement | CoO: 100 NiO |
| 12.0 | 16.0 | 72.0 | 60 | 88 | 153 | 74% | 4.4 |
| 19.2 | 14.2 | 76.6 | 60 | 56 | 124 | 121% | 16.7 |
| 22.0 | 11.1 | 66.9 | 250 | 20 | 63 | 214% | 6.3 |

The above tables, both of which appear in the original German application, are shown by the patentee to illustrate examples of increases in Q-values at a frequency of 1 mc. achieved by variations of 4-component ferrites, as listed in Table 1, and variations of 5-component ferrites, as listed in Table 2.

ponent ferrites having the following compositions, by weight:

| | % | | |
|---|---|---|---|
| Fe$_2$O$_3$ | 71.5 | 76.6 | 66.4 |
| NiO | 15.9 | 4.2 | 10.9 |
| Zno | 11.9 | 19.1 | 21.8 |
| MnO | 2.0 | 2.0 | 2.0 |
| CoO | .7 | .7 | .7 |

18. On November 9, 1954, application Serial No. 467,828 (hereinafter referred to as "the original U.S. application" or "the parent application") was filed in the United States Patent Office in the name of Georg Zerbes. This application was assigned on November 2, 1954 to Stemag and Steatite Research and claimed pursuant to 35 U.S.C. § 119, the priority date of the original German application, November 27, 1953.

19. The original U.S. application disclosed the same ranges relating to the basic 3-component system as was disclosed in the German application. The range of CoO was newly limited to from .1 to 3% based on the total weight of the composition.

20. The original U.S. application also disclosed a range of 5-component ferrites, limited to the same ranges with regard to the basic 3-component systems and restricted to the same CoO limitations as were the 4-component ferrites. Similarly, the claim prescribed an iron oxide content of at least 66% by weight of the total composition as well as a 1 to 5% by weight limitation of the manganese oxide component (see Plaintiff's Exh. 3 at 4–5). The original U. S. application introduced a new statement to the effect that the claimed invention possessed "high quality values in the high frequency region, 200–300 mcs., for example." (Plaintiff's Exh. 3 at 2).

21. On April 25, 1955, the Examiner rejected all claims in the original U. S. application Serial No. 467,828 on the principal ground that the claimed invention was unpatentable over United States Patent No. 2,656,319, filed on January 3, 1949, and issued to Godshalk Berge on October 20, 1953.

22. On April 25, 1956, and on July 4, 1956, respectively, French Patent No. 1,114,518 and British Patent No. 751,633 were published. These patents were counterparts of Zerbes' German application and disclosed substantially the same subject matter.

23. On November 5, 1956, despite a series of amendments which were made to the original U.S. application following its rejection by the Examiner, the Examiner again rejected all the claims therein as unpatentable over United States Patent No. 2,723,239, filed on September 29, 1952, and issued to Robert L. Harvey on November 8, 1955.

24. Although, by amendment, filed April 22, 1957, Zerbes amended claim 3 and added a fourth claim consisting of:

"4. A magnetic core material of a sintered nickel-zinc ferrite, at least 97 to 99.9% by weight of said material consisting essentially of the following components: about 30% by weight of zinc oxide, about 10% by weight of nickel oxide and about 60% by weight of ferric oxide, the remaining 0.1 to 3% by weight of said material consisting essentially of cobalt oxide, calculated as CoO." (Plaintiff's Exh. 3 at 15.)

and despite Zerbes' indication to the Examiner that magnesium oxide (MgO), which is an essential component in the Harvey formula, was not contained in any of Zerbes' own formulae or products, the Examiner, on June 19, 1957, made final his rejection of all the Zerbes' claims as unpatentable over the Harvey reference on the ground that regardless of the manganese oxide addition included in Zerbes' original U.S. application, Table 2 of the patent application, supra n. 5, set forth only one specific composition which represented an improvement (Plaintiff's Exh. 3 at 18). In addition, it was the Examiner's finding that the magnesium component in the Harvey patent was not critical to his invention. (Plaintiff's Exh. 3 at 26.)

25. On October 10, 1957, the original German application was published

for opposition as Published Application No. 1,017,521.

26. On December 13, 1957, Zerbes appealed the Examiner's final rejection to the Board of Appeals and requested an oral hearing, which was subsequently scheduled for February 17, 1960.

27. On August 11, 1958, application Serial No. 754,372 (hereinafter referred to as the "1958 application") was filed in the United States Patent Office. The application contained a new drawing (see Plaintiff's Exh. 2 at 8) in the form of the drawing contained in the patent in suit, *supra* n. 1. The drawing and the specification each disclosed a 3-component range of compositions as follows:

Ferric oxide ($Fe_2O_3$) 66.5%–80.0%
Nickel oxide (NiO) 2.0–29.5%
Zinc oxide (ZnO) 2.0%–31.5%

In the claim herein, Zerbes for the first time states that it is critical to his invention that the proportion of ferric oxide be at least 50 mol percent of the entire composition (Plaintiff's Exh. 2 at 6). The three 5–component ferrite examples from Table 2 of the 1954 parent application were carried over into Table 1 of the 1958 application despite the fact that in the third example, the ferric oxide component was less than 50 mol percent in proportion to the entire composition.

28. Claim 1 of the 1958 application, as originally filed, read as follows:

"1. As a magnetic core material sintered nickel-zinc ferrite of the composition within the area A–B–C–D of Fig. 1 comprising in addition 1 to 5 weight percent of manganese oxide based on the total weight percent, and 1–60% by weight of cobalt oxide based on the proportion of nickel oxide in the said composition, the amount of cobalt oxide being within 0.1 to 3.0% by weight of the total composition, the proportion of iron

oxide in said batch being at least 50 mol percent of the entire composition." (Plaintiff's Exh. 2 at 6.)

29. Similarly, on August 11, 1958, Zerbes filed application Serial No. 754,-371 (hereinafter referred to as "the 1958 sibling application") in the United States Patent Office. This application, like its companion application, was ultimately stated to be a "continuation-in-part" of the 1954 parent application and ultimately issued on July 28, 1964, as United States Patent No. 3,142,645.[7]

30. In contradistinction to the 1958 application, which basically represented the 5-component ferrite matter of the 1954 parent application, the sibling application basically represented the 4-component aspect of its parent. The additional limitations found in the original 1958 application, which limitations were absent in the specification or claim of the parent, were similarly present in the 1958 sibling application with the exception of any reference to the manganese component, which component the sibling application did not claim. Examples 2 and 3 of Table 1 contained in the 1954 parent application, *supra* n. 5, became Table 1 of the sibling (Plaintiff's Exh. 4 at 5).

31. Claim 1 of the 1958 sibling application, as originally filed, stated:

"1. As a magnetic core material a sintered nickel-zinc ferrite of the composition within the area A–B–C–D of Fig. 1 comprising in addition 1–60% by weight of cobalt oxide based upon the proportion of nickel oxide in said composition, the amount of cobalt oxide being within 0.1 to 3.0% based on the total weight percent of said composition and the amount of ferric oxide in said composition being at least 50 mol % of the entire composition including the CoO." (Plaintiff's Exh. 4 at 6.)

32. On April 8, 1959, the 1958 sibling application was rejected by the Examiner

7. A "continuation-in-part" application is one which contains matter not present in the parent case. It may add new mat- ter to a disclosure which is identical with that of the parent case or to a disclosure which represents only a portion thereof.

on the principal ground that claims 1 and 2 were unpatentable over Berge Patent No. 2,656,319, issued October 20, 1953, Harvey Patent No. 2,723,239, issued November 8, 1955, Crowley Patent No. 2,736,708, issued February 28, 1956, Ateliers Patent No. 752,659 (British counterpart of the original German application), issued July 11, 1956, Licentia Patent No. 756,374, issued September 5, 1956, and Medvedieff Patent No. 1,100,865 (French counterpart of the original German application), issued April 13, 1955, all of which disclosed nickel-zinc ferrites with additions of cobalt oxide.

33. On April 16, 1959, the original 1958 application was similarly rejected by the Patent Office as unpatentable over the Ateliers patent which the Examiner cited as clearly disclosing a nickel-zinc ferrite with additions of cobalt oxide and manganese oxide within the areas disclosed by the 1958 application.

34. By amendment to the original 1958 application, filed September 25, 1959, Zerbes altered the specification to state that the application was a continuation-in-part of his original 1954 patent application and inserted a limitation in claim 1 setting forth "[a] magnetic core body having a high Q-factor in the high frequency range of 200-300 mcs. * * *" (Plaintiff's Exh. 2 at 10.)

35. On November 13, 1959, the original parent application was abandoned in favor of the two 1958 continuation-in-part applications.

36. On March 31, 1960, again the 1958 sibling application was rejected by the Examiner principally on the following grounds: (1) The claims failed to recite specific properties and a specific method of preparation; (2) The claims were unpatentable over Harvey Patent No. 2,925,388, issued February 16, 1960, which disclosed certain additions of cobalt to nickel-zinc ferrites, contemplating the amounts specified in the within application; and (3) The claims were unpatentable in that they merely added the teachings of Harvey or Berge to the ferrite of the Albers-Schoenberg Patent No. 2,700,023, filed on March 10, 1951, and issued January 18, 1955.

37. On April 6, 1960, the original 1958 continuation-in-part application was also rejected on substantially the same grounds. Regarding the manganese component, however, the Examiner stated that "[a]dding a small amount of Mn if desired to the ferrite of Crowley et al. is clearly within the teaching of the art." (Plaintiff's Exh. 2 at 16.)

38. On September 28, 1960, Zerbes amended claim 1 of the original 1958 application by inserting therein the limitations "prepared by firing at about 1100°C. to about 1350°C." and "a composition consisting essentially of the NiO, ZnO and ferric oxide components set forth within the area." Coincidentally, Zerbes cancelled claim 2 of the application.

39. On November 1, 1960, Zerbes filed a "substitute oath" in connection with his original 1958 application.[8]

40. On August 25, 1961, the original 1958 application Serial No. 754,372 was allowed by the Commissioner. On January 22, 1962, however, Zerbes filed an amendment changing the limitation of the remaining claim from "a magnetic core body having a high Q-factor in the high frequency range of 200–300 mcs." to one having the same quality "in the high frequency range of up to 300 mcs." (Plaintiff's Exh. 2 at 33).

8. A "substitute oath" is a sworn statement by the inventor that as to those features of his present application not disclosed in his prior application he is unaware of any public use, sale, publication or patent disclosing them more than one year prior to the filing date of the continuation-in-part application. As to the features which were disclosed in the parent application, the oath requires a sworn statement to the effect that the inventor is unaware of any public use, sale, publication or patent, existing more than one year prior to the filing date of said parent application, which disclosed any or all of those features.

41. On May 22, 1962, the original 1958 continuation-in-part application issued as the patent in suit.

42. On or about November 19, 1962, plaintiff sent a letter notifying defendant of the existence of the patent in suit.

43. Defendant has been and presently is engaged in the manufacture of ferrite bodies, some of which are adaptable as material for antenna rods in home radio receiving sets. The four products manufactured by defendant which are accused of infringing the claim of the patent in suit are identified in the trade as K–401, K–411, K–401–1 and K–502.

44. The compositions of the accused ferrites are as follows (see Plaintiff's Exh. 41, as corrected):

| PRODUCT | COMPONENT | WEIGHT % |
|---|---|---|
| K–401 (discontinued November 1, 1963) | | |
| | $Fe_2O_3$ | 74.69 |
| | NiO | 9.27 |
| | ZnO | 13.45 |
| | CoO | .60 |
| | MnO | 1.99 |
| K–411 (discontinued December 31, 1965) | | |
| | $Fe_2O_3$ | 74.15 |
| | NiO | 9.06 |
| | ZnO | 14.71 |
| | CoO | .56 |
| | MnO | 1.26 |
| | CuO | .26 |
| K–401–1 (presently manufactured) | | |
| | $Fe_2O_3$ | 75.67 |
| | NiO | 9.40 |
| | ZnO | 13.63 |
| | CoO | .55 |
| | MnO | .75 |
| K–502 (presently manufactured) | | |
| | $Fe_2O_3$ | 72.35 |
| | NiO | 17.92 |
| | ZnO | 8.39 |
| | CoO | .95 |
| | MnO | .39 |

The relationships of the cobalt components to the nickel components in the accused ferrite bodies are 6.5% of the NiO content in K–401, 6.2% in K–411, 5.85% in K–401–1, and 5.3% in K–502.

*Discussion*

Defendant, while denying that any of its products infringe the patent in suit, argues that the patent is invalid under 35 U.S.C. §§ 112, 282(3) for the following reasons: (1) The terms which define the single claim of the patent in suit are indefinite and ambiguous; (2) The inclusion in the nickel-zinc ferrite body of at least 1 percent of manganese oxide defeats rather than achieves the claimed functional objective of obtaining a high, or, for that matter, a measurable Q-factor at frequencies up to 300 mcs.;

(3) The specification does not support the functional limitation of the claim in that the patent offers no definition as to the lower limit of the "high frequency" range, and, further, fails to set forth any specific examples of nickel-zinc ferrite recipes which accomplish the claimed utility at frequencies up to 300 mcs.; (4) The Ferramic Q composition, or the preferred embodiment of the claimed invention, which composition is the only body which evidences a Q-factor substantially improved over that which has been developed in the prior art, is nowhere disclosed either in any application or in the patent itself; (5) The claimed compositional range bears no relation to actual improvement in the Q-factor but is merely evidence of plaintiff's attempt to monopolize an unduly broad range of the nickel-zinc manganese-cobalt ferrite system; (6) The patent in suit contains two false teachings, that is, (a) that manganese has a quality (Q-factor) improving effect on nickel-zinc ferrites, and (b) that nickel-zinc-cobalt ferrites containing up to 5% or more of manganese oxide are capable of producing measurable Q-factors at frequencies up to 300 mcs. In addition, it is defendant's contention that inasmuch as the single claim of the patent in suit contains the limitation "up to 300 mcs.", which limitation is broader than the corresponding limitation in any prior claim, and which was never sworn to by the inventor in a "supplemental oath", the patent in suit is invalid under 35 U.S.C. § 115.

Passing from a consideration of the terms of the patent in suit to questions of obviousness and anticipation, it is necessary to establish a temporal reference point, that is the effective filing date to which the patent herein is entitled, so that the state of the prior art in existence at that time can be determined. In this regard, it is defendant's principal contention that the patent in suit is entitled to an effective filing date no earlier than August 11, 1958, the filing date of the original 1958 application, inasmuch as said application contained certain claims which were unsup-

ported by the 1954 parent application; specifically, (1) "having a high Q-factor in the high frequency range of up to 300 mcs.", (2) "a composition consisting essentially of the NiO, ZnO and ferric oxide components set forth in weight percent within the area A–B–C–D of the drawing", the area A–B–C–D of the patent in suit encompassing in some respects a broader range of compositions, and (3) "the proportion of iron oxide in said batch being at least 50 mol percent of the entire composition." Assuming August 11, 1958 to be the effective filing date of the patent in suit, defendant argues that the patent would be clearly invalid in that Ferramic Q was in public use and being sold by General Ceramics as early as November 18, 1953, was known and used by customers of General Ceramics a few days thereafter and was anticipated by its own French, British and German counterparts which had been published on December 19, 1955, July 4, 1956, and October 10, 1957, respectively.

Even assuming, *arguendo*, that the claim of the patent in suit is entitled to an effective filing date earlier than August 11, 1958, defendant argues that such date could not be earlier than October 20, 1955, at which time an amendment to the parent application substituting the term "impurities" for the term "additions" introduced "new matter" into the file history. For the same reasons as were stated above, the establishment of an October 20, 1955 effective filing date would likewise render the patent in suit invalid.

Defendant further contends that even assuming that the patent in suit were allowed an effective filing date prior to October 20, 1955, that date could be no earlier than November 9, 1954, the filing date of the parent application, in that the parent application introduced "new matter" not supported by the German grandparent application, such as: (a) the limitation of the CoO range to "from .1 to 3 weight percent"; (b) the limitation of the MnO range to "from 1 to 5 weight percent"; and (c) the characterization of the invention as exhibiting high Q-

factors in the high frequency range of 200–300 mcs. This effective filing date, defendant alleges, would also render the patent invalid by reason of the public use and sale of Ferramic Q material more than one year prior to that date.

Finally, defendant contends that even if this Court were to determine that the effective filing date of the patent in suit were November 27, 1953, the filing date of the grandparent application, the patent would still be invalid for the following reasons: (1) Ferramic Q had been fully commercialized in the United States by General Ceramics on or about November 18, 1953 and, therefore, known and used by others in the United States prior to its date of invention; and (2) The patent in suit was fully anticipated by and obvious in relation to the teachings of the prior art.

At the risk of being somewhat repetitive, the prior art, as it existed on November 27, 1953, consisted essentially of the following compositions and patents:

Berge, No. 2,640,813 alone,

Harvey, No. 2,723,239 (pending) alone,

Crowley, No. 2,736,708 alone,

Ferramic N in view of Crowley and/or Harvey,

Ferramic N in view of Crowley and Berge or Harvey and Berge,

Berge in view of Crowley,

Berge, Ferramic N, Crowley and Harvey taken together.

It is expressly stated in 35 U.S.C. § 112 that:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■ It has been well established that:

"* * * the patentee is required to draft his specifications and claims as precisely as the subject matter permits, and his failure to do so may result in judicial invalidation of his patent." Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 136 (2d Cir. 1958).

■ As a corollary to that proposition, it is established as well that "a patentee cannot arbitrarily select a range in a known progressive change and maintain a patent monopoly on the products falling within that range on the ground that the designated range produces optimum results." Georgia-Pacific Corp. v. United States Plywood Corp., *supra* at 132; Kwik Set v. Welch Grape Juice Co., 86 F.2d 945, 947 (2d Cir. 1936).

■ It appears from a careful examination of the patent in suit that with regard to its description of the claimed invention it fails to set forth the best mode contemplated by the inventor. Although the *preferred* composition, which itself may have been an advance in the development of ferrite materials, was known prior to the effective filing date of the 1954 parent application, it was effectively obscured in both the parent application and the patent in suit. Rather than disclose its specific recipe, plaintiff merely included the elements of the preferred composition within the series of broad ranges claimed by the patent in suit, which ranges extended beyond the area representing significant technological advancement.

Specifically, on August 5, 1953, Stemag communicated by letter to Mr. Salvatore Ortepio (see Plaintiff's Exh. 51), at that time employed as project engineer for General Ceramics, that a discovery had been made of a preferred ferrite composition which disclosed that a small ad-

dition of cobalt oxide to the basic 4-component system produced a significant improvement in both the Q-factor and the temperature coefficient of the ferrite body. The new composition consisted of:

| | Weight % |
|---|---|
| ZnO | 13.3 |
| NiO | 9.0 |
| MnO | 1.8 |
| CoO | .66 |
| Fe$_2$O$_3$ | 75.1 |

Although the letter recited that the above composition was "almost 874-body" (Ferramic N), which product was being marketed and sold by General Ceramics in the latter part of 1952 and throughout 1953, it was claimed that the slight addition of cobalt oxide in combination with the manganese oxide component effected the improvement.

After further independent experimentation was conducted by General Ceramics, the composition was modified as follows:

| | Weight % |
|---|---|
| ZnO | 14.0 |
| NiO | 9.1 |
| MnO | 1.4 |
| CoO | .9 |
| Fe$_2$O$_3$ | 75.1 |

Comparing the 1954 parent application with the patent in suit, the claims therein consist of the ranges as set forth below (within which the preferred composition is included):

| Component | 1954 Application | Patent in Suit |
|---|---|---|
| Fe$_2$O$_3$ | 2 – 40% | 66.5 – 80% |
| NiO | 2 – 40% | 2 – 29.5% |
| ZnO | .1 – 3% | 2 – 31.5% |
| CoO | 1 – 5% | .1 – 3% |
| MnO | 58 – 80% | 1 – 5% |

---

Inasmuch as the Q-values at 1 mc. which were being obtained in the field varied, for all practical purposes, from approximately 63 to 170, and since plaintiff's preferred composition allegedly yielded a Q-value of 470, it appears that plaintiff's composition represented a significant advancement in ferrite development. It is the opinion of this Court, however, that neither the 1954 parent application nor the patent in suit described the invention in such a way as to permit a person skilled in the art to reproduce the preferred composition or achieve the advancement claimed by the patent without himself having to conduct extensive experimentation. If, on the one hand, all the compositions located within the specified ranges produced improved results, the specification contained in both the parent application and the patent in suit would have been an adequate teaching of the claim. However, inasmuch as only certain of the compositions, none of which was specifically set forth, falling within the described ranges produced the desired result, any person skilled in the art was left with no alternative but to experiment with a multitude of possible combinations in order to search out and discover the actual invention.

Compounding this deficiency is the fact that the examples of the 5-component ferrite system set forth in Table 2 of the 1954 application, which table subsequently became Table 1 of the patent in suit, evidence no significant technological advance over the prior art. *Supra* n. 2. The table indicates that at 1 mc., the three examples of the 5-component ferrite will yield Q-values of 153, 124 and 63, respectively. Inasmuch as Harvey Patent No. 2,723,239, issued No-

vember 8, 1955 (see Defendant's Exh. L) shows cobalt additions producing Q-values of 176, 137 and 99, for example, and the Crowley Patent No. 2,736,708, issued February 28, 1956 (see Defendant's Exh. E, Table 1) similarly shows that at 1 mc. the addition of one part $Co_2O_3$ will produce a Q-value of 80.7, somewhat higher than one of the three examples set forth in Table 1 of the patent in suit, the significant advance could not be determined by a consideration of the patent in suit in spite of the possibility that an inventive combination was lurking somewhere therein. Therefore, this Court is constrained to pronounce the patent in suit invalid for failing to comply with the requirements of 35 U.S.C. § 112.

■■■■ A patent which appears to represent a modest improvement in an art in which inventive skill has not been lacking is to be strictly construed, and, thereby, confined to the language of the claim. Garland v. Remington Arms Co., 137 F.Supp. 622, 624 (S.D.N.Y.1956); Filt-O-Pure Prod. Corp. v. Chemex Corp., 124 F.Supp. 22, 24 (S.D.N.Y.1954), rev'd on other grounds, 222 F.2d 424 (2d Cir. 1955). It similarly must be recognized that in order for a claim to be sustained, it clearly must recite a structure or composition which is capable of performing its purported function. Application of Launder, 222 F.2d 371 375, 42 CCPA 886 (1955). Likewise, it is well settled that:

> "* * * if the claims fail to adequately define inventive features by proper limitations, they are not allowable even though the device would support patentable claims." Application of Launder, *supra* 222 F.2d at 375–376.

■■■ The 1954 parent application recited that when the components within the various ranges were combined as set forth in the specification, it was possible to "obtain ferrites with high quality values or Q-factors in the high frequency region, 200–300 mcs., for example, which have not hitherto been at-tained." (Plaintiff's Exh. 3 at 2.) The patent in suit states that:

> "[t]his invention is based on the discovery that certain small additions of cobalt oxide and manganese oxide favorably modify the properties of nickel-zinc ferrites so that high quality values or Q-factors are obtained in the high frequency range of 200–300 mcs., for example." (Plaintiff's Exh. 1.)

It must be noted at this point that although the patent in suit specifies "200–300 mcs., for example", this language was amended on or about January 22, 1962 to read "in the high frequency range of *up to 300 mcs.*" (Plaintiff's Exh. 2 at 33). (Emphasis supplied.)

Defendant contends that the patent in suit is invalid in that the claim of high Q-value in the high frequency range of either "200–300 mcs." or "up to 300 mcs." is, in both instances, a misrepresentation or overstatement of the inventive advance. Plaintiff, on the other hand, contends that "high frequency" is a relative term which includes frequencies in the vicinity of 1 mc. as well as frequencies approximating 300 mcs. Plaintiff further contends that since the phrases "200 to 300 mcs." and "up to 300 mcs." were not included in the parent application and in the patent in suit for the purpose of describing the actual limits of the inventive advance, but merely to cite to any student of the patent an example of what "high frequency" *could be*, the fact that the specification cannot produce a high Q-value throughout the entire high frequency range described in the patent in suit would not be grounds for its invalidation.

It is inconceivable to this Court, however, that plaintiff selected the 200 to 300 mc. range or the phrase "up to 300 mcs." to abstractly describe certain frequencies which could be classified as "high frequency" without intending to imply in any way that its preferred composition or invention produced positive effects at most of the frequency levels falling within the specified high frequency range.

The evidence establishes without doubt that in early 1954, it was plaintiff's belief, after an evaluation of preliminary experimental data, that Ferramic Q, the preferred composition, possessed "a useful frequency range at least up to 30 mcs." (Defendant's Exh. B-1). Subsequently, in the Twelfth Quarterly Progress Report of the General Ceramics Corporation, covering the period between January 1, 1954 and March 31, 1954, it was reported that although Ferramic Q yielded a Q-value of 400 at approximately 1 mc., at 10 mcs. the Q-value dropped off to approximately 55 and was unmeasurable at frequencies above 20 mcs. (Defendant's Exh. A-1). With this knowledge of the effectiveness of its product, it appears evident from the facts herein that plaintiff was more interested in employing a subtle form of puffing in order to create the impression that its composition accomplished results in frequency ranges unapproached by the prior art rather than candidly admitting to the actual limitations of its claim. In effect, therefore, this is an example of a plaintiff, which in its attempt to acquire more rights than it actually deserved, disqualified itself from obtaining those rights to which it might otherwise have been entitled.

As clearly expressed by the Supreme Court in General Elec. Co. v. Wabash Appliance Corp., 304 U.S. 364, 368–369, 58 S.Ct. 899, 901, 82 L.Ed. 1402 (1938):

"Recognizing that most inventions represent improvements on some existing article, process, or machine, and that a description of the invention must in large part set out what is old in order to facilitate the understanding of what is new, Congress requires of the applicant 'a distinct and specific statement of what he claims to be new, and to be his invention.' Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirements as to claims of invention or discovery. The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'"

■ Under no circumstances, therefore, may a patent be granted which describes the subject matter in such a way as to extend the monopoly beyond the invention. General Elec. Co. v. Wabash Appliance Corp., supra at 371, 58 S.Ct. 899; Helene Curtis Industries, Inc. v. Sales Affiliates, Inc., 233 F.2d 148, 153 (2d Cir. 1956); Kwik Set v. Welch Grape Juice Co., supra.

Inasmuch as it is the opinion of this Court that both the specification and claim of the patent in suit (as well as those contained in the 1954 parent application) were not only insufficiently descriptive but, moreover, misrepresentative as to the extent of the inventive advance, the patent in suit must be declared invalid on its face. It should be restated at this point, however, that this Court is not necessarily finding that the plaintiff did not in fact develop a patentable invention. It is merely the conclusion of this Court that by virtue of plaintiff's failure to sufficiently disclose its preferred composition and its attempt to monopolize a greater part of the nickel-zinc ferrite field than it was rightfully entitled to, plaintiff has lost whatever rights it might have had to patent protection.

■ Assuming, arguendo, that the patent in suit were valid on its face, its single claim would be entitled to an effective date of invention no earlier than August 11, 1958, the filing date of the continuation-in-part application, in that the 1958 application (Plaintiff's Exh. 2) contained certain "new matter"

unsupported by the disclosures of the 1954 parent application.

A continuation-in-part application is not entitled to the benefit of the earlier filing date of its parent application where the changes included within the subsequent application are "new matter" which either alters the substance of the invention or makes the composition an invention for the first time, as opposed to the situation in which the subsequent application merely contains either a language change not affecting the meaning of the prior application or a specification which narrows the scope of that which was previously claimed. Application of Moreton, 312 F.2d 954, 957, 50 CCPA 948 (1963); see Indiana General Corp. v. Lockheed Aircraft Corp., 249 F.Supp. 809, 821 (S.D.Cal.1966); Application of Ruscetta, 255 F.2d 687, 691, 45 CCPA 968 (1958).

The 1954 parent application fails to support the continuation-in-part application filed in 1958 (which subsequently matured into the patent in suit) in two principal respects: (1) The limitation requiring that the ferric oxide be at least 50 mol percent of the entire composition, as set forth in the 1958 application and in the patent in suit, is not supported by the "66% by weight" limitation of the parent application; and (2) The claim of the compositions' effectiveness in the high frequency range of "up to 300 mcs." is unsupported by the language contained in the parent application to the effect that the inventive advance produces high Q-values "in the high frequency range of 200–300 mcs., for example."

The criticality of the "50 mol percent" limitation in the patent in suit is expressed as follows (see Plaintiff's Exh. 1):

"The lower line B-C of the quadrangle is just above the 50 mol percent line for $Fe_2O_3$. It has been found that at least enough ferric oxide should be present to react with all the bivalent oxides in the composition *including* ZnO, NiO, CoO and MnO when the latter are added. Thus, the composition employed will be above the line B-C but need be only slightly above this line when amounts close to the minimum required for CoO and MnO are added. The excess of ferric oxide over the 50 mol percent based on the nickel and zinc content is important because it has been found that ferric oxide reacts preferentially with nickel oxide and zinc oxide before it reacts with cobalt oxide and manganese oxide and for the cobalt oxide and the manganese oxide to be effective at least a major portion thereof should be in the form of a ferrite." (Emphasis supplied.)

Therefore, it appears that the 50 mol percent concept requires the addition of varying amounts of ferric oxide depending upon the amounts of manganese and cobalt added to the composition. Naturally, since all the oxides must be in the form of a ferrite, the greater the amounts of cobalt and manganese added to the composition, the greater is the amount of ferric oxide needed to cause the required reaction. A consideration of the parent application in light of the evidence adduced at trial leads this Court to the conclusion that the "66% by weight" limitation is a fixed concept relating solely to the 3-component nickel-zinc ferrite system without dependency upon the manganese and cobalt components. This is evidenced by the clear statement in the 1954 parent application file wrapper (Plaintiff's Exh. 3 at 5) that "[i]t will be realized that the cobalt oxide component is added to the material in the enclosed area of Fig. 1 without increasing the proportion of $Fe_2O_3$." Consequently, by virtue of the fixed concept described in the parent application, that which was claimed to be necessary in the continuation-in-part application would not necessarily be followed in the methodology set forth in the parent application.

In passing to the second unsupported aspect of the 1958 application, it appears obvious that had the original "200–300 mcs." been merely intended as nothing

more than an example of high frequency, there would have been no need to change it. It certainly seems to be as much of an example of high frequency today as it was in 1954. The plain fact is that plaintiff's composition never yielded a Q-value in the frequency range of 200 to 300 mcs. Therefore, in order to include within the claim that range of frequencies throughout which plaintiff's preferred composition did in fact produce a positive effect, while, at the same time, desirous of preserving the impressive but irrelevant 300 mcs. limitation, plaintiff executed the amendment. In other words, plaintiff, in its 1958 application, for the first time included within the terms thereof the relevant frequency range within which plaintiff's invention achieved a significant advance, although that range was still camouflaged within the much broader irrelevant range extending all the way up to 300 mcs.

Thus, since the patent in suit would under no circumstances be entitled to an earlier effective date than August 11, 1958, it would, in any case, be invalid pursuant to 35 U.S.C. § 102(b).

Even if this Court were to assume further, however, that the patent in suit was entitled to the effective date of the original German application, that is, November 27, 1953, this Court would still be constrained to find the patent invalid, pursuant to 35 U.S.C. § 103, in that the claim is "obvious" when considered in the light of the prior art in existence at that time.

Title 35 U.S.C. § 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be neg-

atived by the manner in which the invention was made."

In determining which references cited by the defendant fall within the definition of "prior art", it must be recognized that:

" * * * the 'prior art' referred to in section 103 includes, along with the patents, printed publications, public uses and sales of paragraphs (a) and (b) of section 102, *prior invention* as established by a copending application, *if* it becomes a patent, as contemplated in paragraph (e) * * *. Such prior invention, as prior art, may be combined with other references to sustain a rejection for obviousness under section 103." Application of Harry, 333 F.2d 920, 923–924, 51 CCPA 1541 (1964).

Title 35 U.S.C. § 102(a) (e) provides in pertinent part:

"A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country * * * before the invention thereof by the applicant for patent, or

* * * * * *

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent. * * * ."

Thus, for a patent to be invalid for obviousness under 35 U.S.C. § 103, it need not be anticipated in its entirety by a single reference but may be invalidated by a combination of references, such as an invention previously known and used by others in this country together with a patent in existence prior to the filing date of the application for the patent in suit. Application of Harry, supra 333 F.2d at 924; see Application of Land, 368 F.2d 866, 877 (C.C. P.A.1966). However, a reference con-

sisting of an invention which has been "known or used by others in this country" prior to the application of the patent in suit is only valid if the aforesaid "knowledge and use" is of a public nature. Application of Hilmer, 359 F.2d 859, 878, 53 CCPA 1288 (1966).

 Without indulging in an extensive analysis of each reference cited by the defendant as being prior art, let it suffice to say that plaintiff's Ferramic N material, which had been sold commercially during the latter part of 1952 and throughout 1953 (and therefore publicly "known and used"), when considered in the light of United States Patent No. 2,736,708 to Crowley, filed June 8, 1951 and issued on February ·28, 1956, renders the patent in suit "obvious" as of November 27, 1953 to any person having an ordinary skill in the art of nickel-zinc ferrite development.

The Ferramic N body, as of November 18, 1953 (see Plaintiff's Exh. 50) consisted of the following composition:

| | Weight % |
|---|---|
| NiO | 9.2 |
| ZnO | 13.5 |
| $Fe_2O_3$ | 75.5 |
| MnO | 1.8 |

The Ferramic Q body, which is virtually identical to Ferramic N, with the exception of minor variations for the purpose of adjusting the composition to the small addition of cobalt oxide, consisted of (see Plaintiff's Exh. 44):

| | Weight % |
|---|---|
| NiO | 9.06 |
| ZnO | 14.05 |
| $Fe_2O_3$ | 75.14 |
| MnO | 1.40 |
| CoO | .88 |

The similarity of compositions is not only evident to this Court but, moreover, was recognized by Dr. Albers-Schoenberg in his letter of August 5, 1953 to Salvatore Ortepio (see Plaintiff's Exh. 51) in which he stated that the Ferramic Q composition was "almost 874-body" or, as it is referred to in the trade, Ferramic N. Although Dr. Albers-Schoenberg was referring to the Ferramic Q composition as originally proposed, that composition was no more dissimilar to the Ferramic N body than was the composition of Ferramic Q which General Ceramics finally released on the commercial market.

The Crowley patent (Defendant's Exh. E) taught that small additions of cobalt oxide enhanced the Q-value in nickel-zinc ferrite compositions. With specific reference to Table 1 of that patent,[9] Crowley set forth figures which indicate that a significant rise in Q-value takes place when anywhere from .1 to ·3 parts cobalt oxide is added to the basic composition. As clearly specified, the addition of .1 part of cobalt oxide

9.

TABLE I

*Cobalt oxide ($Co_2O_3$) as the additive agent*

| Parts $Co_2O_3$ | 50 kc. | | 1 mc. | | 10 mc. | | 20 mc. | | 50 mc. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q | μc | Q | μc | Q | μc | Q | μc | Q | μc |
| 0 | 176 | 2.85 | 62 | 6.49 | 47.5 | 4.52 | 20.8 | 3.21 | 17.5 | 1.58 |
| 0.1 | 221 | 3.12 | 74.1 | 6.45 | 65.7 | 5.15 | 23.3 | 3.15 | 18.8 | 1.54 |
| 0.2 | 212 | 2.84 | 79 | 5.12 | 163 | 4.50 | 30 | 3.03 | 21.4 | 1.53 |
| 0.3 | 212 | 2.94 | 78 | 6.04 | 129 | 4.71 | 36.6 | 3.05 | 21.4 | 1.52 |
| 0.4 | 212 | 2.89 | 78.5 | 6.02 | 69 | 4.60 | 49 | 3.04 | 22.7 | 1.51 |
| 0.5 | 212 | 2.91 | 78 | 6.0 | 141 | 4.67 | 41.6 | 3.06 | 22.1 | 1.53 |
| 0.6 | 209 | 2.83 | 78 | 5.88 | 155 | 4.48 | 61.4 | 3.01 | 24.7 | 1.51 |
| 0.7 | 204 | 2.81 | 79 | 5.53 | 154 | 4.43 | 74 | 3.00 | 24.7 | 1.53 |
| 0.8 | 205 | 2.91 | 78 | 5.95 | 157 | 4.10 | 85 | 3.04 | 24.6 | 1.54 |
| 0.9 | 213 | 3.01 | 76 | 6.00 | 159 | 4.95 | 89.4 | 3.05 | 24 | 1.55 |
| 1 | 199 | 2.77 | 80.7 | 5.64 | 151 | 4.35 | 91 | 2.97 | 27.5 | 1.54 |
| 3 | 108 | 2.54 | 75.2 | 5.16 | 132 | 3.92 | 116 | 2.73 | 64.4 | 1.47 |
| 5 | 141 | 2.45 | 66.9 | 4.58 | 107 | 3.45 | 100 | 2.57 | 93.8 | 1.43 |
| 10 | 85 | 2.07 | 50.5 | 3.41 | 67.5 | 2.94 | 70 | 2.50 | 85.5 | 1.31 |
| 20 | 62 | 1.63 | 40.5 | 2.37 | 50.9 | 2.04 | 55.9 | 1.68 | 81.2 | 1.19 |
| 50 | 51 | 1.21 | 42.9 | 1.80 | 52.5 | 1.31 | 60.6 | 1.19 | 88.4 | 1.05 |

will increase the Q-value at 1 mc. from 62 to 74.1. The Q-value reaches 80.7 with the addition of approximately 1 part cobalt oxide, falls off to 75.2 with the addition of 3 parts cobalt oxide (still a significant degree of improvement) and loses all its improved Q-value with any further increase (above 3 parts) of the cobalt component. It is no wonder, therefore, why it is that the patent in suit claims the addition " * * * of cobalt oxide, being within 0.1 to 3.0% by weight of the total composition * * * ". It is similarly interesting to note that plaintiff's preferred composition contained .9% cobalt oxide, an amount which sits practically on top of the 1 part addition shown by Crowley to achieve optimum results.

In sum, even giving the patent in suit the benefit of the earliest possible effective filing date, that is, November 27, 1953, it must be declared invalid for obviousness under 35 U.S.C. § 103 in light of Ferramic N as viewed together with the Crowley patent.

[14] Lastly, it should be mentioned that had this Court found the patent in suit to be valid, only defendant's K-401 ferrite composition (a product which defendant discontinued in the latter part of 1963) would have infringed it.[10]

10. Comparison of Defendant's Products to Patent in Suit in Terms of Weight Percent of the Components

| Comp. | Ranges of the Patent in Suit | Defendant's Products | | | |
|---|---|---|---|---|---|
| | | K-401 | K-401-1 | K-411 | K-502 |
| $Fe_2O_3$ | 66.5 – 80 % | 74.68 | 75.67 | 74.15 | 72.35 |
| NiO | 2 – 29.5% | 9.27 | 9.40 | 9.06 | 17.92 |
| ZnO | 2 – 31.5% | 13.45 | 13.63 | 14.71 | 8.39 |
| CoO | .1 – 3 % | .59 | .55 | .56 | .95 |
| MnO | 1 – 5 % | 1.98 | .75 | 1.26 | .39 |
| CuO | ------ | ----- | ----- | .26 | ---- |

As previously mentioned in the text, a patent which represents a modest improvement in a crowded art is confined to the four corners of its claim. Garland v. Remington Arms Co., 137 F.Supp. 622, 624 (S.D.N.Y.1956); Filt-O-Pure Prod. Corp. v. Chemex Corp., 124 F.Supp. 22, 24 (S.D.N.Y.1954), rev'd on other grounds, 222 F.2d 424 (2d Cir. 1955).

Comparing defendant's products with the limitations set forth in the patent in suit, it is apparent that defendant's K-411 contains .26 weight percent of copper oxide whereas the patent in suit does not include that component within its composition. Secondly, it must be noted that while the lower limitation of the manganese component in the patent in suit is 1 weight percent (of the entire composition), the manganese component added to K-401-1 is only .75 weight percent and, similarly, in K-502 is as low as .39 weight percent.

Inasmuch as this Court must give a strict construction to the limitations contained within the patent in suit, it clearly must be held that the inclusion of copper oxide in defendant's K-411 ferrite product removes it from the shadows of infringement.

The question remains, however, whether this Court, bearing in mind the degree of exactitude which can reasonably be expected from scientific measurement and the degree of unavoidable variation in the measured amounts of each component, can reasonably limit the coverage of the patent in suit to the precise amounts as stated therein.

Plaintiff argues that the lower limitation of the manganese component in the patent in suit cannot be strictly held to 1 weight percent in that the patent specifically states that:

"With the manganese * * * oxide, it is small quantities *of the order of magnitude of 1 weight percent* of the batch, which effects the improvement, yet the manganese can be considerably increased (up to 5% by weight of the composition, for example) without diminishing the effect." (Emphasis supplied.)

Dr. Rudolf Tenzer, presently Manager of Research of the Electronics Division of Indiana General Corporation, testified that the allowable variation of any numerical figure should be the order of magnitude of that number. For example, orders of magnitude are ordinarily defined

*Conclusions of Law*

1. This Court has jurisdiction of this action pursuant to 35 U.S.C. § 281 and 28 U.S.C. §§ 1338(a), 1400(b).

2. The patent in suit, United States Letters Patent No. 3,036,009, is invalid pursuant to 35 U.S.C. §§ 112, 282(3) in that the specification fails to contain language which adequately describes the best mode contemplated by the inventor of carrying out his invention so as to enable any person skilled in the relevant art to make and use the same.

3. The patent in suit is similarly invalid pursuant to 35 U.S.C. §§ 112, 282 (3) in that the specification and related table do not support the claim of utility, *i.e.*, "up to 300 mcs.".

4. The patent in suit is invalid pursuant to 35 U.S.C. §§ 112, 282(3) for overclaiming in that the claimed compositional range is not delimited by limitations corresponding to marked changes in Q-values at specific frequencies.

5. Assuming the single claim of the patent in suit were valid on its face, it would be entitled to no effective filing date earlier than August 11, 1958, in that certain of its limitations were in no way supported by the 1954 parent application, to wit:

a. "having a high Q-factor in the high frequency range of up to 300 mcs."

b. "the proportion of the iron oxide in said batch being at least 50 mol percent of the entire composition."

and, consequently, invalid pursuant to 35 U.S.C. § 102(b).

6. Assuming, further, that the single claim of the patent in suit were entitled to an effective filing date as early as November 27, 1953, it would be invalid pursuant to 35 U.S.C. § 103 on the grounds of obviousness when considered in the light of plaintiff's Ferramic N composition viewed together with Crowley Patent No. 2,736,708.

by steps of factors of 10, *i. e.*, .1, 1, 10, 100. To establish the lines separating one order of magnitude from another, the factor of 3 should be employed inasmuch as the factor .1 multiplied by 3 equals .3, and, similarly, the next higher 10-factor or 1, if divided by 3, equals approximately .3. From that calculation, Dr. Tenzer concludes that .3 is the lower limitation of the order of magnitude of the numeral 1. Continuing further, since 1 multiplied by 3 equals 3, and, similarly, since the next higher 10-factor or the numeral 10, if divided by 3, equals approximately 3, Dr. Tenzer concludes that the upper limitation of the order of magnitude of 1 is the numeral 3. In sum, according to Dr. Tenzer's theory, the order of magnitude of 1 weight percent of manganese oxide consists of any amount which falls within the range of .3 weight percent to 3 weight percent.

If this Court were to accept Plaintiff's "order of magnitude" theory as representing the expected range of variability with reference to the specific numerical range limitations, it would have to apply it to the upper limitations as well as to the lower. For example, if this Court were to accept the lower limitation of the manganese component (1 weight percent) to be any amount between .3 weight percent and 3 weight percent, likewise it

would have to be accepted that the order of magnitude of the upper limitation of the zinc component (31.5 weight percent) permits the patent to cover an amount totally out of proportion to that which is actually claimed. In addition, and most importantly, the "order of magnitude" theory becomes patently academic in light of Dr. Tenzer's testimony that after extensive testing, the iron component in the amount of 74 weight percent *consistently* varied no more than .2 weight percent and, similarly, *the addition of 2 weight percent of the manganese component consistently varied no more than .1 weight percent.* It appears, therefore, that the smaller the amount of the particular addition, the smaller the expected variation thereof. Additionally, it is the expected variation as evidenced by extensive testing rather than plaintiff's proposed variation according to its abstract "order of magnitude" theory that this Court adopts as a guideline herein.

It is the conclusion of this Court, therefore, that neither defendant's K–401–1 product containing .75 weight percent of manganese oxide nor its K–502 ferrite product containing .39 weight percent of the manganese component fall either within the express limitations of the patent in suit or within the necessarily expected variations thereof.

7. Finally, assuming that the patent in suit were valid, only defendant's K–401 material, a product which has been discontinued since 1963, would have been held to have infringed it.

8. Plaintiff's demand for an injunction and damages is in all respects denied.

9. The complaint is dismissed and judgment shall be entered in favor of the defendant.[11]

It is so ordered.

## MEMORANDUM OPINION

These are motions by plaintiff, Indiana General Corporation (hereinafter referred to as "Indiana General") and by defendant, Krystinel Corporation (hereinafter referred to as "Krystinel"), pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, to amend certain findings of fact incorporated in my original opinion, dated November 20, 1968, and for additional findings of fact and conclusions of law based on the evidence presented at trial. Both motions were timely filed with this Court.

After due consideration, plaintiff's motion is granted to the extent indicated below.

Solely with regard to the Manganese oxide component, Finding of Fact No. 7 is amended to read as follows:

Manganese oxide (MnO) 1 to 5%

so as to conform precisely with the terms of the patent in suit.

The following Findings of Fact are added to this Court's prior opinion:

45. Defendant's K–401–1 material, initially manufactured during November, 1963, and which replaced defendant's K–401 material, was used and sold for the same purposes as its predecessor.

46. Defendant's K–401–1 material has had the same formula and weight percents of ingredients from its first production in 1963 to the present

time, although there is evidence of at least one batch which varied from the standard formula. (See Plaintiff's Exh. 48.)

47. Defendant's K–401–1 ferrite material has been sold for uses, other than radio antenna cores, at frequencies of 200 megacycles; however, the functionality of such other uses did not require the presence of a high Q-factor in the ferrite material.

Plaintiff's other proposed additions are not only unsupported by the weight of the evidence but also, in certain instances, are irrelevant to the context in which they are sought to be placed.

With regard to defendant's motion, it, too, is granted to the extent indicated and for the reasons set forth in the remaining portion of this opinion.

Finding of Fact No. 32 is amended to read as follows:

32. On April 8, 1959, the 1958 sibling application was rejected by the Examiner on the principal ground that claims 1 and 2 were unpatentable over Berge Patent No. 2,656,319, issued October 20, 1953, Harvey Patent No. 2,723,239, issued November 8, 1955, Crowley Patent No. 2,736,708, issued February 28, 1956, Steatite Patent No. 751,623 (British counterpart of the original German application), issued July 4, 1956, Ateliers Patent No. 752,659, issued July 11, 1956, Licentia Patent No. 756,374, issued September 5, 1956, and Medvedieff Patent No. 1,100,865, issued April 13, 1955, all of which disclosed nickel-zinc ferrites with additions of cobalt oxide.

Finding of Fact No. 33 is amended to read as follows:

33. On April 16, 1959, the original 1958 application was similarly rejected by the Patent Office as unpatentable over Steatite Patent No. 751,623 and the Ateliers patent, which the Examiner cited as clearly disclosing a nickel-

---

11. Inasmuch as this Court finds no evidence of bad faith on the part of the plaintiff herein, defendant's application for counsel fees is denied. Formal

Fashions, Inc. v. Braiman Bows, Inc., 254 F.Supp. 389, 395 (S.D.N.Y.), aff'd, 369 F.2d 536 (2d Cir. 1966).

zinc ferrite with additions of cobalt oxide and manganese oxide within the areas disclosed by the 1958 application.

Defendant's concern with the words "patentable invention", as used by this Court on page 442, is unfounded inasmuch as the disputed term is preceded by the phrase "at this point", which indicates that the statement in its entirety is rhetorical in nature, referring solely to that which had been previously discussed, and bearing no relation to my final conclusions.

Most of defendant's numerous proposed additional findings of fact have been offered with a view towards a reconsideration of whether the facts in this cause distinguish it as that kind of "exceptional case" which, pursuant to 35 U.S.C. § 285, justifies an award of reasonable attorneys' fees to the defendant herein.

The defendant argues that such an "exceptional case" exists where, it is urged, the issuance of the patent in suit was procured by fraud on the Patent Office. The specific actions taken by the plaintiff, which form the basis of defendant's contention, are as follows: (1) plaintiff represented that the claimed ferrites could achieve high Q-factors "in the high frequency region of 200–300 mcs, for example" or "up to 300 mcs" when it knew at the time that it made such a representation that the useful frequency range had an upper limitation of approximately 30 mcs; (2) plaintiff failed to disclose to the Patent Office, as prior art, its Ferramic N material, knowing its similarity to the ferrite material claimed by the patent in suit; (3) plaintiff concealed a known 35 U.S.C. § 102(b) statutory bar by making three oaths, all of which were false by reason of certain "new matter" contained within the 1958 application and in the patent in suit, which matter was unsupported by the 1954 parent application; and (4) plaintiff failed to set forth the "best mode" of its invention by purposely camouflaging its improved formula in a series of irrelevant ranges.

Although plaintiff, in its offers of explanation, denies the existence of any fraudulent intent underlying its representations to the Patent Office, a discussion with regard to these specific issues of fact is not necessary to the principal determination herein.

It is established in this District that only where the court is convinced that the patent in suit is so wholly devoid of substance that the plaintiff could not have had a bona fide belief in its validity shall it award the defendant reasonable attorneys' fees pursuant to 35 U.S.C. § 285. Merry Hull & Co. v. Hi-Line Co., 243 F.Supp. 45, 57 (S.D. N.Y.1965); Bussemer v. Artwire Creations, Inc., 231 F.Supp. 798, 805 (S.D. N.Y.1964).

In the present case, although the plaintiff was, in the opinion of this Court, somewhat less than candid in its relations with the Patent Office, and in spite of the fact that this Court found, among other reasons plaintiff's patent invalid for "obviousness", plaintiff's claim represents an inventive advance which, although not worthy of patent protection, is sufficient to support a bona fide belief in the patent's validity, thereby removing plaintiff from the shadows of bad faith.

Nevertheless, this Court is disposed to add the following Findings of Fact to my original opinion, as requested by the defendant herein:

48. Throughout the prosecution of the parent application and the 1958 application, plaintiff represented to the Patent Office that its invention was based upon the discovery that, by the addition of CoO to the claimed range of nickel-zinc-manganese ferrites, it was possible to obtain ferrites having a high Q-factor "in the high frequency region, 200–300 mcs, for example". This assertion first appeared in the specification of the parent application, and remains in the specification of the patent in suit. In the 1958 application, this same representation appeared, ultimately, as a limitation in

the claim and, after allowance of the claim, was amended to "the high frequency range of up to 300 mcs".

49. At the time this statement of utility first appeared in the parent application, plaintiff had already reported to the Signal Corps that although Ferramic Q exhibited a Q-factor of 400 at approximately 1 mc, at 10 mcs the Q-factor decreased to approximately 55 and was unmeasurable at frequencies above 20 mcs.

50. In the oath annexed to the 1958 application, as filed, as well as in the two substitute oaths subsequently filed, Zerbes swore that the features of his invention, described and claimed in this application and not disclosed in the parent application, had not been in public use or on sale in the United States for more than one year prior to said application.

51. The limitation in the claim of the 1958 application to ferrites containing proportions of iron oxide amounting to "at least 50 mol percent of the entire composition" was new matter not disclosed in the parent application.

52. Although plaintiff expressly recognized that the preferred embodiment (Ferramic Q) of the Zerbes discovery was "almost 874–body" (Ferramic N), a ferrite material, previously sold commercially by plaintiff, this prior art was not disclosed to the Patent Office in the successive applications for the patent in suit.

The following Conclusion of Law shall be added to the prior opinion of this Court:

10. The patent in suit is not of such a nature as to make this case an "exceptional" one for the purpose of requiring plaintiff to pay reasonable attorneys' fees to defendant pursuant to 35 U.S.C. § 285.

Accordingly, the motions by plaintiff and defendant are granted to the extent indicated herein.

It is so ordered.