**STUDIENGESELLSCHAFT KOHLE mbH, as Trustee for the Max-Planck-Institut fur Kohlenforschung, Plaintiff,**

v.

**EASTMAN KODAK COMPANY, Defendant.**

**Civ. A. No. B–74–392–CA.**

United States District Court, E. D. Texas, Beaumont Division.

Sept. 21, 1977.

See also 392 F.Supp. 1152.

Cleve Bachman, Orgain, Bell & Tucker, Beaumont, Tex., Arnold Sprung, Nathaniel D. Kramer, Burgess, Dinklage & Sprung, New York City, for plaintiff.

**1214**

O. J. Weber, Jr., Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., Francis T. Carr, Kenneth E. Madsen, Alan T. Bowes, Kenyon, Kenyon, Reilly, Carr & Chapin, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOE J. FISHER, Chief Judge.

The above-styled and numbered cause came on for trial by the Court and the Court having considered the pleadings, the evidence adduced at the trial and in depositions and documents, the arguments of counsel and stipulations of counsel, and the briefs filed by the respective parties, and having been fully advised, makes and files its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. NATURE OF THE SUIT AND JURISDICTION

1. This is a patent infringement suit brought by plaintiff, Studiengesellschaft Kohle, mbH, a German corporation, as Trustee for the Max-Planck-Institut fur Kohlenforschung ("Institute") against defendant, Eastman Kodak Company ("Eastman"), a New Jersey corporation. Plaintiff alleges that defendant, by its manufacture of certain chemical products in its Longview, Texas plant within this District, has infringed the following U. S. patents Nos.: 3,257,332 entitled "Polymerization of Ethylene" (hereinafter the "'332 patent"); 3,231,515 entitled "Catalysts" (hereinafter the "'515 patent"); 3,392,162 entitled "Polymerization of Ethylenically Unsaturated Hydrocarbons" (hereinafter the "'162 patent") and 3,826,792 entitled "Polymerization of Ethylenically Unsaturated Hydrocarbons" (hereinafter the "'792 patent"). Plaintiff originally also charged infringement of U. S. patent No. 3,113,115 entitled "Polymerization Catalyst" (hereinafter the "'115 patent"), but in March 1975 moved to withdraw the '115 patent from suit, which motion was granted with prejudice.

2. Plaintiff possesses legal title to the patents in suit but the Institute is the real owner thereof and has agreed to be bound in this litigation as if joined as a party herein (Undertaking filed September 17, 1976).

3. Defendant asserts that plaintiff is estopped from enforcing the patents in suit because of laches in bringing this action, denies that it has infringed any of the patents, asserts that all patents are invalid and unenforceable on various grounds set out in the Pre-Trial Order and has by counterclaim asserted a claim for breach of confidential duty.

4. Trial was held from September 21, 1976 to October 7, 1976. Extended post-trial depositions and testimony were taken thereafter. The parties have extensively briefed the questions presented. Extended oral argument was granted both parties on April 19, 1977.

5. The four patents in suit all pertain to chemical compositions known as catalysts which find use in processes for the production of certain synthetic polymers. Much of the basic chemical terminology is treated extensively in *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858 (C.A. 5, 1973) at pp. 862–63. It is not repeated here in detail. A chemical catalyst is a substance which affects the rate and course of a given chemical reaction (e. g., a polymerization) in some manner without becoming a significant part of the reaction product (e. g., polymer). Thus, the use of a chemical catalyst is an integral part of the definition of that particular catalyst. Catalyst activity is unpredictable, and modest changes in catalyst composition can have profound and unpredictable effects on the results obtained.

Much of the testimony concerns the polymerization of ethylene and propylene. Both are olefins, but they differ greatly in their ability to polymerize. The polymerization of propylene is more complicated than that of ethylene and can form two different "stereostructures" of polypropylene. One is an intrinsically amorphous and soft material ("atactic" polypropylene), while the other is a hard crystalline material ("isotactic" polypropylene). The latter

alone is of substantial commercial importance. Catalysts having the property of inducing the formation of the "isotactic" structure are called "stereospecific" catalysts.

## II. DESCRIPTION OF THE PATENTS IN SUIT

6. The '332 patent is directed to a polymerization catalyst for the polymerization of the monomer ethylene. In general, the catalyst is formed by mixing a first component, an aluminum trialkyl compound (e. g., aluminum triethyl), with a second component, a selected transition metal compound (e. g. titanium tetrachloride). The resulting reaction product is the catalyst. The scope of this patent was previously considered in *Ziegler v. Phillips*, 483 F.2d 858 (C.A. 5, 1973).

7. The '792 patent is directed to the process of using the catalyst of the '332 patent and further purports to extend the '332 patent by applying the use of the same catalysts to the polymerization of higher olefins, e. g., propylene, butene and pentene.

8. The '515 patent purports to be directed to polymerization catalysts for lower olefins (from ethylene up to pentene). The '515 catalyst differs from that of the '332 and '792 patents in that the first component used to prepare the catalyst composition is composed of certain alkali alkyl compounds (e. g., lithium butyl).

9. The '162 patent purports to be directed to the use of the catalysts of the '515 patent to polymerize "ethylenically unsaturated hydrocarbons", which would literally include polymerization of olefins generally, including ethylene up to pentene.

## III. THE ZIEGLER PATENT APPLICATIONS

10. The patents in suit are based upon work performed in the laboratories of the Institute during 1953–54, at which time Prof. Karl Ziegler was its Director. This resulted in filing a series of 13 German patent applications which subsequently became the subject of 8 separate U. S. patent applications. Seven of these original U. S. applications were directed solely to the polymerization of ethylene to polyethylene. One application, S.N. 514,068, purported to disclose the polymerization of propylene and other higher olefins. These original U. S. applications were thereafter reorganized and refiled as a series of "consolidated" applications, three of which ultimately led to the patents in suit, as set forth in the table below:

| Application S.N. | Filing Date | Original Applns. Consolidated | Patent No. In Suit |
|---|---|---|---|
| 745,998 | 7/1/58 | 469,059; 527,413; 554,631; 514,068 | abandoned |
| 125,151 | 3/17/71 | [refiling of S.N. 745,998 appln.] | '792 |
| 745,850 | 7/1/58 | 554,609; 554,631; 514,068 | '162 |
| 745,809 | 7/1/58 | 554,609; 554,631 | '515 |

The remaining patent in suit ('332) issued from original application S.N. 469,059.

## IV. EASTMAN'S ACCUSED POLYPROPYLENE OPERATION

11. Starting in the mid-1950's and continuing steadily thereafter, Eastman conducted catalyst research which resulted in about 1957 in the development of a catalyst, called "402", made by co-reacting lithium aluminum hydride ($LiAlH_4$) with hydrogen-reduced alpha-titanium trichloride (H-$TiCl_3$). After continuing research, Eastman, in 1967, developed another lithium-based catalyst called "409". This was used at high temperature (160°C) to produce good yields of highly crystalline, high molecular weight polypropylene. Both the 402 and later the 409 catalysts were used by Eastman to commercially manufacture polypropylene on a large scale at Longview, Texas. The Eastman polypropylene process is unique to the industry.

12. Eastman's 409 catalyst is prepared from the co-reaction of three components: lithium butyl (LiBu), aluminum triethyl ($AlEt_3$) and hydrogen-reduced alpha-titanium trichloride (H- $\alpha$-$TiCl_3$) in a mol ratio of 0.3 to 0.3 to 1.0, respectively. Eastman's 409 catalyst was itself an invention which was patented as U. S. 3,679,775.

13. All of the patents in suit are asserted by plaintiff to be infringed in certain respects by Eastman's use of the 409 catalyst and process to make the highly crystalline, high molecular weight polypropylene, and to co-polymerize propylene with small amounts of ethylene (about 1%) to form a modified polypropylene product which Eastman calls "polyallomer".

## V. DEFENSE OF LACHES AND ESTOPPEL

### A. *Eastman's Commercial Polypropylene Activities*

14. Eastman erected its polypropylene plant in 1961 at a cost of $7,087,000. Thereafter, the plant was continuously enlarged and production increased. Before issuance of any of the patents in suit, Eastman had expended $11,000,000 on its plant and thereafter it expended an additional $6,000,000. Production was increased from an initial 7,500,000 lbs. per year in 1961 to more than 120,000,000 lbs. per year by the time the complaint herein was filed. Since issuance of the '515, '332 and '162 patents and prior to the present suit, Eastman's production using the 409 catalyst has increased about two-fold, i. e., by about 75,000,000 lbs. per year.

### B. *Ziegler's Awareness of Eastman's Commercial Activities*

15. Plaintiff was aware of Eastman's commercial entry into the polypropylene market since at least 1963. Although plaintiff claims not to have known the identity of the specific catalyst used by Eastman, it nonetheless believed throughout the entire period from at least 1964 until suit that Eastman was an infringer of one or more Ziegler's catalyst patents. When plaintiff instituted this suit in March 1974, it knew as much about the specific catalyst and process used by Eastman as at any earlier time. Lack of specific knowledge of Eastman's 409 catalyst was not a deterrent to suit.

16. While there were sporadic contacts between Eastman Kodak and Ziegler during 1966-1970, at no time did Ziegler openly charge infringement, nor did he at any time state that Eastman needed a license in order to legally operate its plant. None of these contacts was such that Eastman was put in reasonable apprehension of being sued for infringement of any patent now in suit. No actual notice of infringement was given to Eastman prior to the institution of this suit in March 1974.

17. Plaintiff presented no evidence that the existence of other litigation prevented it from sooner instituting the present suit. It had both the manpower and resources to engage in multiple litigation and in fact did so.

18. Plaintiff's delays from the date of issuance of the patents in suit until their actual assertion against Eastman were:

| Patent In Suit | Date of Issuance | Date Asserted | Delay |
|---|---|---|---|
| '115 | 12/03/63 | 3/29/74 | 10 years, 3 months |
| '515 | 1/25/66 | 5/06/74 | 8 years, 4 months |
| '332 | 6/21/66 | 3/29/74 | 7 years, 9 months |
| '162 | 7/09/68 | 5/06/74 | 5 years, 10 months |
| '792 | 7/30/74 | 7/31/74 | 1 day |

### C. *The Losses of Witnesses, Memories and Documents*

19. There are four key participants in Ziegler's patent affairs whose testimony was no longer available to Eastman, specifically, Prof. Karl Ziegler (deceased), Dr. Andreas von Kreisler (deceased), Dr. Ralph Dinklage (poor memory) and Col. Harry Toulmin (deceased).

20. Prof. Ziegler was the head of the Institute, the principal inventor, the guiding genius, and title holder of the patent rights. He was in complete personal control of obtaining, using and enforcing the patent rights until his death in August 1973. Ziegler decided what to file and where. He designated the inventors and wrote the applications.

21. The other participants possessed vital information which is no longer available. All were patent advisors who assisted Ziegler in various critical phases of his efforts to define, obtain and enforce the patents in suit. The evidence they could have given was not shown to be available from any other source.

22. In lieu of the above four witnesses, plaintiff offered as the most knowledgeable witness now available, Dr. Heinz Martin, a co-patentee and the manager of plaintiff. He has a large financial interest in the outcome of this litigation. His knowledge of the 20-year old history of Ziegler's work and patent affairs was quite incomplete and secondhand. He was frequently unable to explain why certain actions were taken in connection with the prosecution of various Ziegler patent applications.

23. Many documents are missing which could have an important bearing on issues raised by defendant in the litigation. Ziegler's internal documents relating to studies of Eastman's catalyst systems, to Eastman's alleged infringement, and to Ziegler's decision concerning suit against Eastman in 1967 do not exist. In addition, contemporaneous written statements prepared by Ziegler's alleged co-inventors setting forth their views on their respective inventive contributions, and Prof. Ziegler's own written statement setting forth his views on the contributions to the inventions by the alleged co-inventors, are missing. The entirety of von Kreisler's own files have been destroyed.

24. Eastman has been prejudiced by plaintiff's delay because of the significant and continuing investment in its plant and expansion of its facilities, the loss of evidentiary material pertinent to the issues in this litigation through the death of or loss of memory by key witnesses and the loss or destruction of key documents. Further prejudice resulted to Eastman because of the unusually long periods of time the patents in suit were pending prior to issuance. Therefore, in view of the total circumstances, plaintiff's long delay in instituting suit after issuance of the '332, '515 and '162 patents was unreasonable.

D. *The Delay in Issuance of the '792 Patent*

25. The subject matter leading to the claims of the '792 patent was pending in the Patent Office for about 20 years before the patent was issued. At least 8 years of this delay was of plaintiff's own making and was solely due to the plaintiff's attempt to secure a second patent covering essentially the same subject matter that had already been obtained on issuance of the '332 patent in 1966. This unnecessary delay in the issuance of the '792 patent also resulted in prejudice to Eastman on the same basis as given above.

## VI. NONINFRINGEMENT

### A. *The '332 Patent*

26. Claim 1 of the '332 patent states: "Polymerization catalyst, comprising the product formed by mixing

[a] an effective amount of aluminum trialkyl with

[b] a compound of a metal selected from the group consisting of

■ salts, freshly precipitated oxides and hydroxides of

■ metals of Groups IV–B, V–B and VI–B of the Periodic System, including thorium and uranium."

Thus, claim 1 calls for a catalyst composition made from the reaction of two components, [a] and [b].

### (1) *The Polymer*

27. The actual invention of the '332 patent is a catalyst only for the polymerization of ethylene. It does not embrace catalysts for the polymerization of propylene, which was neither disclosed nor contemplated by the patent. Ziegler's initial and subsequent U. S. patent filings demonstrate that he intentionally limited the '332 patent to a catalyst for the polymerization of ethylene.

28. Polypropylene is a product having its own unique characteristics and properties. It is a distinctly different product than polyethylene. Unlike linear polyethylene, polypropylene comes in different structural forms (i. e., isotactic, atactic) that have distinct and differing properties.

29. Eastman uses its accused 409 catalyst solely to polymerize propylene to solid highly crystalline polypropylene, or in the case of polyallomer, to produce a modified polypropylene containing no polyethylene.

It does not make polyethylene, and hence does not practice the invention of the '332 patent.

### (2) The Catalyst

30. The '332 patent is directed to the catalytic composition formed when the two components (aluminum triethyl and for example, titanium tetrachloride) are co-reacted to form a new composition of matter. In contrast, the 409 catalyst composition is formed by co-reacting a different combination of three ingredients (LiBu, AlEt$_3$, H $\cdot \alpha$ – TiCl$_3$), using amounts differing from those described in the '332 patent. The active catalyst formed is the integral result of the interactions of all three components, each of which is essential to the composition and behavior of the 409 catalyst. None of the components can be omitted and still produce a catalyst that will yield a satisfactory, useful polymer.

31. Plaintiff has failed to prove that the composition of matter which constitutes the catalyst of the '332 patent is actually ever formed in the preparation of Eastman's 409 catalyst.

32. Though the '332 patent refers generically to "titanium chlorides", the only titanium chloride actually disclosed as useful in the preparation of catalysts is titanium tetrachloride. The H–$\alpha$–TiCl$_3$ used by Eastman is a distinctly different material, structurally and chemically, from TiCl$_4$. H $\alpha$ – TiCl$_3$ is a violet-colored solid having a specific and unique crystal structure, and it is insoluble in the solvents used in the polymerization process. TiCl$_4$ is a clear liquid having no crystal structure, and it is soluble in the solvents used for polymerization. These distinctions are unimportant for the polymerization of ethylene, but are very important for the polymerization of propylene. Because of these structural differences, a catalyst formed using H–$\alpha$–TiCl$_3$ is capable of making highly crystalline polypropylene whereas one formed with TiCl$_4$ is not. H–$\alpha$–TiCl$_3$ is not such a titanium chloride as is contemplated by the '332 patent.

33. The 409 catalyst is formed from the integral effect of three components, only one of which (AlEt$_3$) is actually disclosed or contemplated in the '332 patent, and the resulting 409 catalyst composition is not substantially the same as that described and claimed in the '332 patent.

34. The 409 catalyst is not an equivalent of the '332 catalyst. The "means" used by Eastman—its catalyst—has a composition unlike anything contemplated by the '332 patent (Findings, supra). A comparison of the "operation" (process) and "result" (polymer) of the use of the 409 catalyst with that of the '332 patent confirm their non-equivalence:

(a) Eastman's 409 catalyst is used in a high temperature process (160°C) to make effective quantities of high molecular weight polypropylene having a high content of isotactic (crystalline) structures. By contrast, the '332 patent does not disclose any high temperature process comparable to that used by Eastman and discloses no catalyst capable of inducing the polymerization of propylene at high temperature or of forming polypropylene of highly crystalline (isotactic) structure.

(b) The behavior of H–$\alpha$–TiCl$_3$ in the 409 catalyst is unique and critical. Other titanium salts, such as the TiCl$_4$ disclosed in the '332 patent, or even other TiCl$_3$ structures, are not suitable substitutes.

(c) The catalyst disclosed in the '332 patent which is most comparable to the 409 catalyst is that formed from aluminum triethyl plus titanium tetrachloride (AlEt$_3$/TiCl$_4$). This catalyst is ineffective in making polypropylene under Eastman's process conditions. Conditions can be found under which this '332 catalyst does induce the polymerization of propylene, but the resulting product does not have properties which would make it a useful plastic and it is totally unlike the product of the 409 process.

The 409 catalyst is basically a different catalyst from the invention of the '332 patent.

### B. *The '792 Patent*

35. The '792 patent has not before been the subject of any lawsuit. The disclosure of the '792 patent is based on an application filed July 1, 1958 that consolidated four earlier patent applications (See Finding 10, *supra*). Only one of these, S.N. 514,068, disclosed the polymerization of propylene and higher olefins, and it was the first U.S. application of Ziegler et al to do so. It taught that the mol ratio of the two components used to make the catalyst (i. e., the ratio of aluminum compound to heavy metal compound) was "controlled and critical" within the range of 1 to 1 and 12 to 1, i. e., that the ratio should not be less than 1 to 1. That application also taught that the maximum polymerization temperature is 150°C. However, these limitations of mol ratio and temperature were not referred to when application S.N. 514,068 was later consolidated with the three ethylene applications on July 1, 1958.

36. Since plaintiff contends that the catalyst of the '792 patent is the same as the catalyst of the '332 patent, Eastman does not use the process of the '792 patent because it does not use the catalyst thereof (See Findings 30–34). Unlike the '332, the '792 patent discloses two examples showing the preparation of a polypropylene product. However, the polypropylene which could be made from following the teachings of the '792 patent was shown to lack practical value; it differs substantially in crystallinity, tensile strength, stiffness and softening point from the product of the 409 process. The 409 catalyst and process are neither fairly disclosed nor contemplated by the '792 patent nor could it be considered the equivalent thereof. It is a different and distinct catalyst and process.

37. Plaintiff presented no proofs in support of its allegations of infringement of any of the asserted polyethylene claims of the '792 patent or the '332 patent by reason of Eastman's "polyallomer" manufacture. On the other hand, Eastman showed that its polyallomer was not a polyethylene product as required by the asserted claims of the '792 and '332 patents.

### C. *The '515 and '162 Patents*

38. The '515 patent relates to a polymerization catalyst made from the reaction of two components: an alkali alkyl, e. g., lithium butyl (LiBu) and defined transition metal salts, such as titanium tetrachloride (TiCl$_4$). The '162 patent is for the process of using the '515 catalyst and is therefore, in reality, for the same invention. Neither have been in suit before. Neither has been of any practical value or been commercially used by anyone. Ziegler considered them "unimportant".

39. Claim 1 of the '515 patent reads as follows:

"A polymerization catalyst composed of a mixture of a first and second component

[a] said first component being substantially composed of a member of the group consisting of

■ alkali metal alkyls and aryls;

■ complexes of

[i] alkali metal alkyls and complexes of alkali metal hydrides with

[ii] a metal organo compound of metals consisting of magnesium and zinc; and

■ complexes constituted of two metal organo compounds of the group of metals consisting of aluminum, magnesium and zinc,

[b] said second component being a heavy metal compound selected from the group consisting of the salts and the freshly precipitated oxides and hydroxides of the metals of Groups IV–B, V–B and VI–B of the Periodic System, including the thorium and uranium,

[c] each of said components being present in an amount with respect to the other, to cooperatively act therewith forming an active olefin polymerization catalyst."

Plaintiff has admitted that the scope of the catalyst definition in claim 1 of '162 is the same as that of claim 1 of '515.

40. The 409 and '515/'162 catalyst compositions are not the same:

(a) Plaintiff has failed to show that the catalyst composition of the '515/'162 pat-

ents is ever formed in Eastman's accused operations.

(b) Eastman does not use a "first component" that is "substantially composed of" an alkali metal alkyl, e. g., LiBu.

(c) Eastman's H–α–TiCl$_3$ is not a "heavy metal compound" as contemplated by the '515/'162 patents (Compare Finding 32).

(d) The catalyst of the '515/'162 patents is prepared from two components, it does not contemplate the presence of AlEt$_3$ as used in 409. The 409 catalyst is not a mere mixture of two catalysts—one formed from AlEt$_3$ and H–α–TiCl$_3$ and the other from LiBu and H–α–TiCl$_3$.

41. The 409 catalyst and process are not the equivalents of '515/'162. The '515/'162 patents do not disclose any working examples showing the use of the catalyst of the invention for polymerization of propylene. The catalyst described in the patents that is closest to the 409 catalyst is one formed from LiBu and TiCl$_4$. A composition prepared from these ingredients, using the preferred mol ratio of the patents, is ineffective in polymerizing propylene under Eastman's 409 operating conditions. Eastman's 409 catalyst is operable and useful, while the composition of the '515/'162 patents under similar conditions is not.

D. *File Wrapper Estoppel*

42. As originally filed, the applications leading to the '515 and '162 patents, S.N. 745,809 and S.N. 745,850, respectively, disclosed and claimed a polymerization catalyst (and process utilizing such catalyst) wherein the first component of the catalyst included "complexes of alkali metal alkyls with a metal organo compound of aluminum. . . ." Such a component would include a complex formed from contacting lithium butyl with aluminum triethyl.

43. During the prosecution of Ziegler's applications for the '515 and '162 patents, the Patent Office rejected Ziegler's original claims in view of the prior art U.S. patent No. 2,905,645 to Anderson et al. The Anderson et al patent disclosed a catalyst system wherein the first component used to make the catalyst was a lithium aluminum tetraalykl. This component is a "complex of an alkali metal alkyl with a metal organo compound of aluminum" as defined in Ziegler's applications.

44. Ziegler determined that the Anderson et al patent directly anticipated the claims of S.N. 745,809 as to the "alkali metal alkyl/organo aluminum complex" catalyst component, and intentionally caused both applications to be amended to exclude such a complex from the scope of the claims and to thereby avoid conflict with the Anderson patent.

45. The '515 and '162 patents, as issued, reflect this voluntary limitation in the scope of the original claims. The essence of what remained after deletion of aluminum compounds was the combination of an alkali metal alkyl and heavy metal salt, e. g., LiBu/TiCl$_4$, but without AlEt$_3$. See *Application of Ziegler*, 347 F.2d 642, 52 CCPA 1473 (1965).

46. In the preparation of Eastman's 409 catalyst, the complex formed from mixing an aluminum compound (AlEt$_3$) with lithium butyl (LiBu) is used. Thus Eastman uses the same subject matter given up by Ziegler (LiBu plus AlEt$_3$).

47. The '332 and '792 patents likewise cannot be construed to embrace the catalysts deleted from the '515/'162 patents. Catalysts formed from use of the LiBu-AlEt$_3$ complex were not disclosed nor contemplated in the '332 or '792 patents; rather they were considered by Ziegler et al to be part of the separate and independent invention of the '515/'162 patents from which such catalysts were irretrievably deleted.

INVALIDITY OF THE PATENTS IN SUIT

A. *Failure to Adequately Disclose or Teach the Polymerization of Propylene*

48. The '332, '515 or '162 patents in suit do not contain any explanation or teaching regarding the process of polymerizing propylene, the nature of any polypropylene

product, or how to use it in any practical sense. By comparison, the teachings in these patents concerning the polymerization of ethylene, the characterization of the polyethylene product and its uses, are full and informative. (Defendant makes no attack as to the adequacy of the teachings pertaining to ethylene).

49. The teachings in the patents in suit regarding the polymerization of ethylene cannot be applied to propylene. It was well known to Ziegler that the behavior of propylene was different than that of ethylene and the reactions of one could not be predicated on the reactions of the other. In addition, while polyethylene was a known commodity at the time of the Ziegler applications, polypropylene was not, and so teachings specific to its preparation, properties and usage were necessary. Experiments showed that most of the catalysts described in the '332, '162 and '515 patents as useful for ethylene polymerization were ineffective when applied to propylene or other higher olefins.

50. The '792 patent contains two examples concerning propylene, but otherwise contains no teachings directed to propylene. The examples describe the polypropylene product sketchily and make no reference to the existence of crystalline structure, or to any practical application of the resulting polymer. Experiments showed that polypropylene polymer made by following the limited teachings of '792 lacked any practical value.

51. No catalyst described in the patents in suit was shown to be capable of making useful, highly crystalline polymers of propylene, or other higher olefins. The claims of all patents embrace catalysts and process conditions that are inoperative for propylene. Excessive experimentation, amounting to inventive acts, would be required to overcome the deficiency in the teachings of the patents in suit and to discover the actual (undisclosed) catalysts and conditions required to make and recover a useful polypropylene product.

### B. The Lack of Reference to the Known Teachings of Natta et al

52. The discovery, isolation, and characterization of the important crystalline (isotactic) polypropylene structure was originally made by Prof. G. Natta in mid-1954. Later in 1954 he discovered special catalysts, based on the unique properties of $\alpha$–$TiCl_3$, that preferentially produced the crystalline isotactic structure. These discoveries, which have been acknowledged by Ziegler, won the Nobel Prize for Natta in 1963, which he shared with Ziegler. Although Ziegler et al were aware of these discoveries at the time they applied for their own U.S. patents, these teachings for obtaining useful highly crystalline polypropylene were not incorporated in the Ziegler et al applications.

### C. Invalidity in View of the Prior Art

#### (1) Effect of Prior Invention by Natta et al on the '792 Patent

53. Natta et al filed patent applications covering their discoveries on polypropylene first in Italy and then in the United States. This resulted in the grant of several U.S. patents. One of these, U.S. patent No. 3,582,987, discloses a catalyst prepared from aluminum triethyl and titanium tetrachloride that is identical to that defined by the claims of the '792 patent. Natta discloses the use of such a catalyst to polymerize propylene to solid high molecular weight polypropylene.

54. The Natta '987 patent issued on a U.S. application claiming priority of Italian application 25,109/54, filed July 27, 1954. The Italian application contains the same pertinent disclosure as the U.S. application and fully describes the alleged invention of claims 22–32 of the '792 patent. Natta's Italian application antedates the August 3, 1954 filing in Germany of Ziegler et al's priority application Z4348 wherein they first described the polymerization of propylene.

#### (2) Effect of the Prior Invention by Fischer on '332 and '792

55. The record presents substantial conflicting views as to the anticipatory effect

of the disclosure of Fischer German patent 874,215. All of this mass of evidence was taken in depositions outside the presence of the Court. Accordingly, the Court is unable to conclude that the defendant has clearly and convincingly overcome the presumed validity of the polyethylene claims of the '792 and '332 patents over the Fischer reference.

### (3) Effect of the Prior Inventions of DuPont Researchers on the '515 and '162 Patents

56. Contemporaneously with the work being done by Ziegler in his laboratories in Mulheim, Germany in 1954, other researchers in the laboratories of DuPont in Wilmington, Delaware, were also active in the same field. DuPont researchers in 1954 developed a number of catalysts for polymerizing ethylene and other olefins. The use of catalysts formed from alkali alkyl (as a first component) and titanium tetrachloride (as a second component) was conceived in April 1954 and the effectiveness of such catalysts for polymerizing ethylene to a useful solid polymer was proven at least by August 25, 1954. Other experiments performed by DuPont researchers prior to December 27, 1954 successfully used catalysts formed from lithium butyl and titanium tetrachloride to make useful polyethylene polymer. This DuPont work, which was independent of any knowledge of the corresponding Ziegler work, became publicly known and was not abandoned, suppressed or concealed. The DuPont work fully describes the alleged inventions of the '515/'162 patents. Plaintiff has not proved a conception or reduction to practice in this country of the alleged invention of the '515/'162 patents prior to the December 27, 1954 filing date of the German priority applications Z4628 and Z4629, and thus such inventions were antedated by the DuPont work.

### (4) Effect of Pieper on the '515/'162 Patents

57. U.S. patent No. 2,867,612 was issued to Pieper et al on January 8, 1959 on application S.N. 558,804 filed October 5, 1955, which claimed priority of German application F 15877 filed October 8, 1954 in Germany. It discloses the polymerization of ethylene to high molecular polyethylene with catalysts formed by mixing titanium tetrachloride with an organic alkali metal compound, such as lithium butyl. The disclosures of German application F 15877 and Pieper '612 are substantially the same in this respect and the October 8, 1954 German priority date of the Pieper patent antedates the priority filing date of December 27, 1954 claimed for the '515 and '162 patents.

### (5) Effect of Anderson Patent on the '515/'162 Patents

58. U.S. patent No. 2,905,645 was issued to Anderson et al (assigned to DuPont) on September 22, 1959 on application S.N. 450,-243 filed August 16, 1954, and thus constitutes prior art against the '515/'162 patents. The '645 patent discloses the production of high molecular polyethylene by catalysts formed from mixing certain titanium compounds, such as $TiCl_4$, with reducing agents such as metal alkyls or aryls and similar organometallic compounds. Lithium butyl is a "metal alkyl" within the scope of the disclosure of the '645 patent. Example VI of the '645 patent uses an ethylene polymerization catalyst that is the same as that of the '515/'162 patents except that the example uses lithium phenyl rather than lithium butyl as a reducing agent for $TiCl_4$. However, it was already known that lithium butyl was also a reducing agent for $TiCl_4$ and behaved like lithium phenyl in this respect. Accordingly, as of August 16, 1954, it would have been obvious to a person of ordinary skill in the art to use lithium butyl in place of lithium phenyl in Example VI of the Anderson '645 patent and thus make the invention of the '515/'162 patents.

### (6) Effect of Prior Art on the '515/'162 Patents to the Extent They are Construed to Cover Catalysts or Processes for Polymerization of Propylene or Olefins Generally

59. The applications for the '515 and '162 patents (S.N. 745,809 and S.N.

745,850 filed July 1, 1958) are the first Ziegler et al applications to disclose *both* alkali metal alkyls and their use as components of catalysts for polymerizing propylene or olefins generally.

60. The invention claimed in the '515 and '162 patents, insofar as such patents purport to cover catalysts and processes for the polymerization of propylene or olefins generally (as distinct from the coverage of ethylene specifically) is fully described in the following patents, all of which constitute prior art having effective dates before July 1, 1958:

(a) British patent specification No. 785,-314, published October 23, 1957.

(b) Belgian patent No. 543,941, granted June 24, 1956.

(c) U.S. patent No. 2,880,199 (Jezl), issued March 31, 1959 on an application filed November 2, 1956.

(d) Spanish patent No. 225,790 published October 1, 1956. This patent is essentially the same as Ziegler's German application Z4628, one of the priority applications for the '515 and '162 patents. It describes a catalyst for the polymerization of ethylene (an "ethylenically unsaturated hydrocarbon") and was granted more than one year prior to July 1, 1958.

### D. *Invalidity of the Propylene Claims of '792 in View of Late Claiming*

61. One week after plaintiff gained detailed knowledge of Eastman's 409 catalyst, it filed (on April 30, 1974) independent claim 22 of the '792 patent containing new "comprising" type language. This new claim 22 replaced a prior one directed to a catalyst prepared from two components and sought to substitute therefor one which was susceptible to the construction that it could include additional components. Independent claim 22 of the '792 patent, under those circumstances, cannot be broadly construed as embracing the different three component catalyst used by Eastman since such language was first introduced seven years after Eastman had established intervening usage of its catalyst and two years after a U.S. patent thereon had issued to Eastman.

### E. *Invalidity Because of Double Patenting*

62. The '162 patent issued almost 2½ years after the issuance of the '515 patent. These patents differ only in that the '515 patent claims a catalyst composition, while the '162 patent claims the *use* of the same catalyst composition. There is no known utility for the '515 catalyst except in a process as claimed in the '162 patent. One cannot distinguish between the alleged invention of the '515 patent and the alleged invention of the later '162 patent. They are the same.

### F. *Invalidity Because of Broadened Construction*

63. Each of the following prior art patents have an effective date prior to July 1, 1958 and disclose the catalysts of the '792, '162 and '515 patents for the polymerization of propylene while using mol ratios of organometal compound to heavy metal (e. g., $AlEt_3$ to $TiCl_4$) of less than 1 to 1 and at temperatures of 150°C or higher:

(a) U.S. patent No. 2,880,199 (filed November 2, 1956).

(b) British patent spec. No. 785,314 (published Oct. 23, 1957).

(c) Belgian patent No. 543,941 (granted June 24, 1956).

### G. *"Unclean Hands" Defense*

64. The defendant has asserted various defenses of unenforceability of the patents because of plaintiff's "unclean hands". In light of the Court's disposition of the issues of validity and infringement, it finds it is unnecessary at this time to consider the copious record relating to such additional defenses.

### H. *Defendant's Counterclaims for Breach*

65. Inasmuch as this Court has concluded that the introduction in April 1974 of the "comprising" type language into the pending '792 claims did not broaden the scope of

the pre-existing claims directed to the use of a two component catalyst (Finding 61), and that the issued claims do not embrace the use of the three component catalyst used by defendant, it finds no injury was caused defendant by the language change.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and over the parties to this action. 28 U.S.C. §§ 1338, 2201, 2202; 35 U.S.C. § 281.

■ 2. The enforcement of the patents in suit is barred by laches and estoppel because Eastman has been prejudiced by plaintiff's inexcusable and unreasonable delay in filing suit in that Eastman substantially expanded its investment and production at its Longview, Texas plant before institution of suit, was denied the testimony of a number of important witnesses by death or loss of memory, and was denied access to key documents which had been destroyed or were otherwise unavailable because of the passage of time. It would now be inequitable to enforce plaintiff's claim. *Advanced Hydraulics, Inc. v. Otis Elevator Company*, 525 F.2d 477 (C.A. 7, 1975); *Brennan v. Hawley Products Co.*, 182 F.2d 945 (C.A. 7), cert. denied, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631 (1950); *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d 153 (C.A. 10, 1954); *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375 (C.A. 7, 1972); *Technitrol, Inc. v. Memorex Corp.*, 376 F.Supp. 828 (N.D.Ill.1974), aff'd per curiam, 513 F.2d 1130 (C.A. 7, 1975); *Smith v. Sinclair Refining Co.*, 257 F.2d 328, 330 (C.A. 2, 1958); *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008 (C.A. 7, 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971).

■ 3. Plaintiff's failure to sooner institute suit was not excused by the pendency of other patent litigation it was prosecuting. *American Home Products Corp. v. Lockwood Manuf. Co.*, 483 F.2d 1120 (C.A. 6, 1973), cert. denied, 414 U.S. 1158, 94 S.Ct. 917, 39 L.Ed.2d 110 (1974).

■ 4. The conclusion of unreasonable and prejudicial delay is applicable to the '792 patent even though it was recently issued because plaintiff purposely and unjustifiably delayed issuance of the '792 patent for eight years in order to extend its monopoly on the use of the catalyst of the '332 patent.

■ 5. The finding in *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858 (C.A. 5, 1973) that the scope of the invention of the '332 patent was limited to a catalyst for the polymerization of the ethylene is binding on plaintiff and plaintiff is estopped to assert that the scope of the '332 patent extends to a catalyst for the polymerization of other monomers, such as propylene. *Iron Ore Co. of Canada v. Dow Chemical Co.*, 177 U.S. P.Q. 34 (D.C.Utah 1972), aff'd, 500 F.2d 189 (C.A. 10, 1974).

■ 6. Independent of the conclusions concerning the '332 patent in *Ziegler v. Phillips, supra*, this Court concludes that the claims of that patent are limited to a catalyst for the polymerization of ethylene and do not extend to propylene.

7. Accordingly, because defendant uses its 409 catalyst to polymerize propylene to solid propylene, or in the case of polyallomer, to produce a modified polypropylene containing no polyethylene, Eastman's 409 catalyst does not infringe any claim of the '332 patent.

■ 8. Plaintiff has failed to prove that the catalyst composition formed from the two components disclosed and claimed in the '332 patent is actually ever formed in the preparation of the 409 Eastman catalyst made from three components. There is no literal infringement of any claim of the '332 patent.

■ 9. The 409 catalyst is not the equivalent of the '332 catalyst for the polymerization of propylene. They differ basically in means, operation and results. The 409 catalyst does not infringe any asserted claim of the '332 patent under the doctrine of equivalents. *Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Boyden*

*Power Brake Co. v. Westinghouse*, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); *Phillips Petroleum Co. v. Sid Richardson C & G Co.*, 293 F.Supp. 555, 571 (N.D.Texas 1968), aff'd, 416 F.2d 10 (C.A. 5, 1969); *Marvin Glass & Assoc. v. Sears Roebuck & Co.*, 448 F.2d 60, 62 (C.A. 5, 1971).

■ 10. The '792 patent is the "process" counterpart to the '332 catalyst patent and requires use of the same catalyst composition as that of '332. Therefore, defendant's propylene process does not infringe claims 22–32 of the '792 patent for the reasons assigned in Conclusions of Law 8 and 9, *supra*. Nor does Eastman's polyallomer process, which makes no polyethylene, infringe any of the asserted polyethylene claims of the '792 patent.

■ 11. Plaintiff has failed to prove that the catalyst composition which is the essential element of the '515 and '162 patents is ever formed in the preparation of the Eastman 409 catalyst. There is no literal infringement of any asserted claims of the '515 and '162 patents.

■ 12. The Eastman 409 catalyst is not the equivalent of the catalysts of the '515 and '162 patents in either the means, operation or results. Hence the 409 catalyst and the use thereof does not infringe any claim of the '162 and the '515 patents under the doctrine of equivalents. (Cases cited, CL 9).

■ 13. The doctrine of file wrapper estoppel prohibits plaintiff from asserting a construction of the claims of the '515 and '162 patents which would embrace the subject matter of the lithium butyl and aluminum trialkyl complex which the applicants removed from the claims of the '515 and '162 patents during prosecution in order to avoid prior art. *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 870 (C.A. 5, 1973); *Smith v. Magic City Kennel Club, Inc.*, 282 U.S. 784, 790, 51 S.Ct. 291, 75 L.Ed. 707 (1931). Inasmuch as Eastman uses a lithium butyl-aluminum trialkyl complex in the preparation of the 409 catalyst, plaintiff is estopped to contend that Eastman infringes the '515 and '162 patents.

■ 14. Ziegler et al having given up all claims to any monopoly in the catalyst formed by use of a complex of aluminum trialkyl and lithium butyl, irreversibly dedicated that subject matter to the public. That dedication cannot be reversed and taken away from the public through the guise of totally different patents, e. g., '332 or '792, neither of which contemplate such a catalyst system. See *Sontag Chain Stores v. National Nut Co.*, 310 U.S. 281, 289–90, 93, 60 S.Ct. 961, 84 L.Ed. 1204 (1940). Consequently, Eastman does not, by using such a dedicated combination, infringe the '332 or '792 patents.

■ 15. The catalysts and processes disclosed in the patents in suit, insofar as they relate to the polymerization of propylene, are either inoperative or make polymers that have no practical utility. Extensive experimentation would be required in order to determine how to make and use the alleged invention. Accordingly, each of the patents in suit, insofar as the claims thereof purport to embrace catalysts or processes for the polymerization of propylene, is invalid because its specification fails to contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or which it is most nearly connected, to make and use the same. 35 U.S.C. § 112. *Corona Cord Tire Co. v. Dovan Chemical Corp.*, 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610 (1928); *Libbey-Owens-Ford Glass Co. v. Celanese Corp.*, 135 F.2d 138, 145 (C.A. 6, 1943), cert. denied, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442 (1943); *Shelco, Inc. v. Dow Chemical Co.*, 322 F.Supp. 485, 517 (N.D.Ill.1970), aff'd, 466 F.2d 613 (C.A. 7, 1972), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972); *Graver Tank & Mfg. v. Linde Air Products Co.*, 336 U.S. 271, 276, 69 S.Ct. 535, 93 L.Ed. 672 (1949); *Phillips Petroleum Co. v. Shell Oil Co.*, 166 F.2d 384, 386 (C.A. 5), cert. denied, 335 U.S. 817, 69 S.Ct. 37, 93 L.Ed. 372 (1948); *Fruit Treating Corp. v. Food Machinery Corp.*,

112 F.2d 119 (C.A. 5), *cert. denied*, 311 U.S. 679, 61 S.Ct. 47, 85 L.Ed. 437 (1940); *Health Products Corp. v. Ex-Lax Mfg. Co.*, 22 F.2d 286, 287 (C.A. 2, 1927).

16. Each of the claims of the patents in suit is invalid to the extent it purports to cover catalysts or processes for the polymerization of propylene, because the patent specifications do not set forth how to make a useful, practical product as required by 35 U.S.C. § 101. *General Steel Products Co. v. Lorenz*, 204 F.Supp. 518, 523 (S.D.Fla. 1962), *aff'd*, 337 F.2d 726 (C.A. 5, 1964); *Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

17. Each of the claims of the patents in suit is invalid to the extent it purports to cover catalysts or processes for the polymerization of propylene because the inventors did not set forth in their applications the best mode contemplated by them for the practice of their invention as required by 35 U.S.C. § 112. *Benger Laboratories, Ltd. v. R. K. Laros Co.*, 209 F.Supp. 639, 644 (E.D.Pa.1962), *aff'd per curiam*, 317 F.2d 455 (C.A. 3), *cert. denied*, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963).

18. The earliest possible effective invention date for claims 22 through 32 of the '792 patent (relating to the polymerization of propylene and higher olefins) is August 3, 1954, the filing date of Ziegler et al's Z4348 application in Germany wherein propylene polymerization was first disclosed. *Application of Saunders*, 219 F.2d 455, 457, 42 CCPA 763 (1955); *Application of Kyrides*, 159 F.2d 1019, 1021–22, 34 CCPA 920 (1947). Such polypropylene claims are invalid as anticipated by the disclosure of prior art patent No. 3,582,987, granted to Natta et al with an effective invention date in this country of July 27, 1954. 35 U.S.C. §§ 102(e) and (g); *James B. Clow & Sons, Inc. v. U. S. Pipe & Foundry Co.*, 313 F.2d 46 (C.A. 5, 1963); 35 U.S.C. §§ 119, 104.

19. The earliest effective invention date in this country to which the '515 and '162 patents are entitled is December 27, 1954. Prior to that date one or more researchers at the DuPont Company in this country had already invented (conceived of and reduced to practice) the claimed catalyst and process of the '515 and '162 patents, and said DuPont researchers did not abandon, suppress or conceal the invention. Accordingly, the '515 and '162 patents are anticipated by the prior invention of the DuPont researchers and are invalid. 35 U.S.C. § 102(g).

20. The U.S. patent No. 2,867,612 issued to Pieper fully describes the inventions of the '515 and '162 patents and has an effective U.S. invention date of October 8, 1954. Accordingly, the '515 and '162 patents with an effective date no earlier than December 27, 1954, are invalid because anticipated by the Pieper patent. 35 U.S.C. §§ 102(e) and (g); § 119; *J. B. Clow v. U. S. Pipe & Foundry, supra.*

21. U.S. patent No. 2,905,645 issued to Anderson et al, based on an application filed in the U.S. on August 16, 1954, fully describes or, in view of the known use of lithium butyl as a reducing agent for $TiCl_4$, renders obvious the inventions claimed in the '515 and '162 patents. Accordingly, the '515 and '162 patents are invalid as having been anticipated or rendered obvious in light of the disclosures of the Anderson patent. 35 U.S.C. §§ 102(e), 103.

22. The earliest effective date for the disclosure in the '515 and '162 patents of a catalyst for the polymerization of propylene or olefins generally is July 1, 1958. 35 U.S.C. § 120. By this date that subject matter was already in the public domain as disclosed in British patent 785,314, Belgian patent 543,941, U.S. patent 2,880,199, and Spanish patent 225,790. Accordingly the claims of the '515 and '162 patents, to the extent they purport to cover catalysts and processes for the polymerization of propylene or olefins generally, are invalid. 35 U.S.C. §§ 102(a), (b) and (e); *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859, 874–75 (D.Del.1972); *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 443 (S.D.N.Y.1969), *aff'd*, 421 F.2d 1023 (C.A. 2, 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *Application of Ruscetta*, 255 F.2d 687, 45 CCPA 968 (1958).

23. If the introduction of the "comprising" language in claims 22 through 32 of the '792 patent by amendment of April 30, 1974 is construed to include the presence of additional catalyst components beyond those specifically set forth, then such construction constitutes a broadening of the claim over the prior "formed by" language. *Hoskins Mfg. Co. v. General Electric Co.*, 212 F. 422 (N.D.Ill.1914), *aff'd*, 224 F. 464 (C.A. 7, 1915); *In re Bertsch*, 132 F.2d 1014, 30 CCPA 813 (1943). In such event, the claims are invalid under the doctrine of late claiming, because of the intervening rights established by Eastman through the use of its 409 catalyst and process since at least 1967 and the patenting thereof in 1972. *Webster Electric Co. v. Splitdorf Electric Co.*, 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924); *Chicago & Northwestern Railway Co. v. Sayles*, 97 U.S. 554, 24 L.Ed. 1053 (1878); *Kahn v. Dynamics Corp.*, 367 F.Supp. 63 (S.D.N.Y.1973), *aff'd*, 508 F.2d 939 (C.A. 2, 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1974); *Phillips Petroleum Co. v. Sid Richardson C & G Co.*, 293 F.Supp. 555, 558 (N.D.Tex.1968).

24. A chemical catalyst and the use of that catalyst are the same invention. (*Ziegler v. Phillips*, 483 F.2d 858, 873 (C.A. 5, 1973)). The '162 process patent is merely a second patent for the same invention as the '515 catalyst patent issued to plaintiff two and one-half years earlier. Only one patent may be granted for a single invention; consequently, the '162 patent is void for double patenting. *Miller v. Eagle Mfg.*, 151 U.S. 186, 196–97, 14 S.Ct. 310, 38 L.Ed. 121 (1894); *C-Thru Products, Inc. v. Uniflex, Inc.*, 262 F.Supp. 213, 218 (E.D.N.Y.1966), *aff'd*, 397 F.2d 952 (C.A. 2, 1968); *Southern Implement Mfg. Co. v. McLemore*, 350 F.2d 244, 247 (C.A. 5, 1965).

25. If the '792, '515 and '162 patents in suit are construed to embrace the polymerization of propylene using a catalyst wherein the amount of the aluminum component in relation to the heavy metal component is less than a mol ratio of 1 to 1, or if construed to embrace a process using a polymerization temperature in excess of 150°C, the patents would have an effective first filing date of July 1, 1958. As of that date the claims so construed would be invalid as anticipated by the prior art U.S. patent No. 2,880,199, British patent No. 785,314 and Belgian patent No. 543,941. 35 U.S.C. §§ 102(a), (b); 120.

26. Defendant's counterclaim for breach of confidential duty is dismissed.

27. Defendant's request for reasonable attorneys' fees pursuant to 35 U.S.C. § 285 is denied.